**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Nancie MUNSEY, Defendant–Appellant.**

**No. 04CA1405.**

Colorado Court of Appeals,
Div. III.

May 28, 2009.

As Modified on Denial of Rehearing
July 23, 2009.

Certiorari Dismissed Dec. 21, 2009.

John W. Suthers, Attorney General, Paul E. Koehler, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Richard A. Hostetler, P.C., Richard A. Hostetler, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge MILLER.

Defendant, Nancie Munsey, appeals the trial court's judgment entered on jury verdicts finding her guilty on two counts of theft, one count of attempt to commit theft, four counts of embezzlement of public property, three counts of issuing a false certificate, and one count of attempt to influence a public servant. We remand to the trial court for further proceedings concerning defendant's right to court-appointed post-trial counsel.

## I. Procedural Background and Facts

Defendant, the former chief financial officer of the Elbert County School District Elizabeth C–1 (school district), was charged by indictment with unlawfully causing the school district to pay her compensation in excess of the amount authorized by the school board (Board). She was also charged with improper use of bond-redemption fund money and self-insurance fund money to pay the school district's operating expenses. Defendant was tried jointly with Bruce Bartlett, who had been the school district's superintendent and who was charged with similar crimes concerning his compensation.

Evidence presented at trial shows the following. Defendant's salary was approved each year by a general Board resolution based on "salary schedules" that she prepared and distributed to the Board in advance of public meetings. The salary schedules included proposed salaries for all school district employees other than the superintendent. Each year, the Board approved the proposed employee salaries by a general resolution with little or no discussion or review of the information provided by defendant. Defendant's staff then prepared a contract for each employee, including defendant, which was signed by the employee and stamped with a signature stamp of two Board members. At trial, testimony by Board members revealed that each of them had a different understanding of what was to be included in defendant's compensation. In

any case, defendant actually received payment in excess of the amounts stated in the signed contracts.

In 2001 and 2002, the school district proposed property tax increases to cover the costs of serving a growing student population and increasing teacher salaries. Both were defeated at the polls. However, bonds were issued to fund construction of new schools. Between July and December 2002, defendant used money from the bond-redemption fund to cover the school district's cash flow problems.

With respect to each of her employment contracts for the school years 2000–2001, 2001–2002, and 2002–2003, defendant was charged with:

- Theft or criminal attempt to commit theft, § 18–2–101, C.R.S.2008, and a former version of § 18–4–401 (dollar figures in the theft statute were raised after defendant's indictment, *cf.* § 18–4–401, C.R.S.2008);
- Embezzlement of public property, § 18–8–407, C.R.S.2008; and
- Issuing a false certificate, § 18–8–406, C.R.S.2008.

The attempted theft charge related to defendant's 2002–2003 contract only—in that year the Board discovered the discrepancy in defendant's salary figures.

Defendant's use of the bond-redemption fund and self-insurance fund resulted in two charges of embezzlement of public property, § 18–8–407. Defendant was also jointly charged with Bartlett for attempt to influence a public servant, § 18–8–306, C.R.S.2008.

At the conclusion of a three-week trial, the jury found defendant not guilty of misusing the self-insurance fund but found her guilty on all other counts. Bartlett was convicted on all sixteen counts against him and has filed a separate appeal.

## II. Discussion

### A. Response to Jury Question

■ Defendant contends that the trial court committed structural error in responding to a jury question by instructing the jurors that it was their sworn duty to return verdicts on all counts submitted to them. We disagree.

■ It is the trial court's duty to instruct the jury on all matters of law. *People v. Gordon*, 160 P.3d 284, 288 (Colo.App.2007). If no timely and specific objection is made to the instructions as they are given at trial and no alternative instructions are tendered, a plain error standard of review is appropriate. *People v. Miller*, 113 P.3d 743, 748 (Colo. 2005); *Thomas v. People*, 820 P.2d 656, 659 (Colo.1991); *People v. Galimanis*, 944 P.2d 626, 633 (Colo.App.1997). "Plain error is a trial error that affects the substantial rights of the accused and so undermines the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction." *Hodges v. People*, 158 P.3d 922, 927 (Colo.2007).

■ If an error is structural, however, reversal is mandatory and plain error analysis does not apply. *Id.* An error is structural when it fundamentally affects the framework within which the trial takes place or denies the defendant a basic protection with unquantifiable results. *Bogdanov v. People*, 941 P.2d 247, 253 (Colo.), *amended*, 955 P.2d 997 (Colo.1997); *see also Sullivan v. Louisiana*, 508 U.S. 275, 281, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (denial of right to jury trial is structural error because consequences are "necessarily unquantifiable and indeterminate," rendering criminal trial unable to reliably serve its function).

■ "Examples of structural error include the complete deprivation of the right to counsel, trial before a biased judge, improper exclusion of a member of the defendant's ethnic group from a grand jury, and violation of the right to a public trial." *People v. Baenziger*, 97 P.3d 271, 273 (Colo.App.2004) (citing *People v. Willcoxon*, 80 P.3d 817 (Colo.App.2002)). Improper jury instructions may constitute structural error when the jury is "not properly aware of the standards used in determining a defendant's guilt or innocence" such as when the jury lacks knowledge of the presumption of innocence and requirement of proof beyond a reasonable doubt. *Id.* at 273–74.

Here, the alleged error did not implicate so fundamental a right as those described by *Baenziger*. We therefore reject defendant's contention that the alleged error was structural. Because defendant made no objection at trial, we analyze her contention under the plain error standard of review.

During deliberations, the jury asked the court: "If the jury is hung on one or more counts, but has reached a verdict on the majority of counts, is it considered to be a hung jury for the entire case?" With the approval of counsel for both defendants, the court responded, "It is your sworn duty to reach verdicts on all counts contained in the indictment." Defendant now contends that, by not reiterating that no individual juror should be influenced to change his or her opinion by the opinions of other jurors, this instruction unduly coerced the jury to return verdicts on all counts. We disagree.

A trial court may not give an instruction that expressly or impliedly coerces the jury to reach a verdict regardless of whether that would require a juror to "surrender his conscientious convictions to secure an agreement." *Lowe v. People*, 175 Colo. 491, 494–96, 488 P.2d 559, 561–62 (1971); *see also Jenkins v. United States*, 380 U.S. 445, 446, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965); *People v. Lewis*, 676 P.2d 682 (Colo.1984); *People v. Dahl*, 160 P.3d 301, 306 (Colo.App. 2007); *People v. Raglin*, 21 P.3d 419, 423 (Colo.App.2000). "Upon receiving information that a jury cannot agree on a verdict," a trial court may instruct the jury to continue deliberations, but such instruction must make clear that jurors "should not be influenced to change their opinion by the opinions of the other jurors" and that failure to reach a unanimous verdict will result in a mistrial. *Raglin*, 21 P.3d at 423; *see also People v. Schwartz*, 678 P.2d 1000, 1012 (Colo.1984); *Allen v. People*, 660 P.2d 896 (Colo.1983).

In *Dahl*, a division of this court found coercive a trial court's threat to sanction a juror who failed to appear on the first day of deliberations. *Dahl*, 160 P.3d at 302–03. After he was arrested and brought in front of the court, the juror explained that he was despondent because his friend had committed suicide the day before. *Id.* at 303. The trial court told the juror:

> [T]he defendant's wondering what's going to happen in this case. And the People are wondering what's going to happen in this case, and it's all because you chose to inflict your personal problems on this process, and that's just not acceptable. Do you understand what the Court is saying?

*Id.* The court also said that it was interested in "trying this case to conclusion." *Id.*

On appeal, a division of this court found that

> these circumstances created an unacceptably high risk of a coerced verdict, in that the juror would be too preoccupied to give serious attention to analyzing the evidence and arriving at a personal opinion of guilt or innocence and, consequently, would simply fall in line with whatever view prevailed among the other jurors, in order to promptly bring "the case to conclusion."

*Id.* at 306.

In *Lowe*, the jury foreman came to the court after four hours of deliberation and reported that the jury was deadlocked. *Lowe*, 175 Colo. at 492–93, 488 P.2d at 560. The foreman said that a unanimous verdict would only be reached if "at least one juror [had] a change of mind that [was] not based upon true feeling and belief." *Id.* at 493, 488 P.2d at 560. The trial court replied, "[F]undamentally I think that's how juries finally reach verdicts," and insisted that the jury continue deliberations. *Id.* A verdict was returned about fifty minutes later. *Id.* at 494, 488 P.2d at 560. The supreme court concluded that asking the jury to continue deliberations under these circumstances was "to coerce the one juror into a compromise verdict." *Id.* at 496, 488 P.2d at 561–62.

More recently, a division of this court upheld a less coercive response. In *People v. Grace*, the division held that the trial court properly instructed the jury that it "should continue to deliberate to see if you can resolve the issues" after the jury claimed it was deadlocked. *People v. Grace*, 55 P.3d 165, 170 (Colo.App.2001).

Here, the jury did not categorically state that it was unable to reach a verdict. Nor

was there any indication that further deliberations would not result in a verdict unless at least one juror voted in contravention of his or her true beliefs. Thus, the circumstances in the present case fall far short of the coercive conditions in *Dahl* and *Lowe*. The trial court here did not admonish any individual juror or "condone[ ] acceptance of verdicts based on untrue beliefs of part of the jurors." *Lowe*, 175 Colo. at 496, 488 P.2d at 561. Rather, the court's response to the jury's question merely reminded the jurors that they had taken an oath to return a verdict on each matter at issue. We perceive no error, much less plain error, in the court's response.

### B. Defendant's Absence During Jury Advisement

██ Defendant was absent when the trial court responded to the jury's question discussed in the previous section. She now contends that the court committed reversible error in conducting those proceedings outside of her presence. We are not persuaded.

Because neither defendant nor her counsel asserted a contemporaneous objection on this issue, we review for plain error.

██ A defendant has a constitutional right to be present at all critical phases of a criminal trial. *Grace*, 55 P.3d at 168; *see also* U.S. Const. amends. VI, XIV; Colo. Const. art. II, § 16; Crim. P. 43; *Key v. People*, 865 P.2d 822 (Colo.1994); *Luu v. People*, 841 P.2d 271 (Colo.1992). A defendant's right to be personally present is guaranteed by due process "if the fundamental fairness of the proceeding would be undermined by the defendant's absence." *People v. Isom*, 140 P.3d 100, 104 (Colo.App.2005).

In *Grace*, a division of this court, relying on *Key*, held that a defendant has the right to be personally present when the trial court responds to jury requests during deliberations. *Grace*, 55 P.3d at 168.

Conversely, in *People v. Vega*, a division of this court held that there is no constitutional right to personal presence when the trial court responds to jury questions unless "a fair and just hearing would be thwarted by [the defendant's] absence." *People v. Vega*,

870 P.2d 549, 554 (Colo.App.1993), *aff'd on other grounds*, 893 P.2d 107 (Colo.1995). Similarly, the *Isom* division declined to follow *Grace*, holding that due process does not require the defendant's presence when it would be useless or only slightly beneficial. *Isom*, 140 P.3d at 104.

The record in this case shows that defendant's presence would have been useless, rendering any constitutional error harmless beyond a reasonable doubt. Defendant's counsel was present during the conference and agreed—as did Bartlett's counsel—to the court's response in advance of it being communicated to the jury. As discussed in the preceding section, the court did not err in giving that response to the jury. Defendant, therefore, has failed to demonstrate how her absence from that session prejudiced her. We therefore conclude that the alleged error, if any, did not affect the substantial rights of defendant or undermine the fundamental fairness of the trial. *See Hodges*, 158 P.3d at 927.

### C. Motion for New Trial

Defendant contends that the trial court erred by failing to rule on issues properly raised in her pro se motion for new trial. We disagree.

██ A trial court's decision whether to grant a new trial under Crim. P. 33(c) is reviewed for abuse of discretion. *People v. Jones*, 942 P.2d 1258, 1260 (Colo.App.1996). "The court may grant a defendant a new trial if required in the interests of justice." Crim. P. 33(c). A motion for new trial may be based on newly discovered evidence or on other grounds. *Id.*

Following her conviction, defendant filed a pro se motion for new trial. The motion objected to the court's denial of Bartlett's motion for severance; the court's failure to order a change of venue; the court's exclusion of evidence indicating improper conduct by Board members; and the court's failure to make a final ruling on the statute governing the use of bond-redemption fund moneys, section 22–42–119(1), C.R.S.2008. Defendant also presented an extensive list of evidence obtained in discovery that had not been in-

troduced at trial and which she believed to be exculpatory. The motion argued that the "cumulative effect" of these circumstances required a new trial be granted "in the interest of justice." Both the written motion and defendant's oral argument focused primarily on the evidence that had not been presented at trial.

Defendant contends that the trial court erred in construing her motion to be based on newly discovered evidence and in failing to rule specifically on the "interest of justice" grounds. She emphasized in her reply brief that her argument in this court does not address the merits of the grounds raised in the motion. Rather, defendant contends that the trial court erred by not ruling on the grounds of "interest of justice" apart from the newly discovered evidence issue. We do not agree with that contention.

As an initial matter, we note that the terms "interests of justice" and "newly discovered evidence" do not describe separate grounds for granting a new trial. Rather, newly discovered evidence is one example of a circumstance that can establish that a new trial is required in the interests of justice. *See* Crim. P. 33(c).

It is clear from the record that the court reviewed defendant's written motion for new trial and listened carefully to her extensive argument. At the conclusion of the arguments on defendant's and Bartlett's new trial motions, the court ruled that "both motions are hereby denied." The court found that the evidence described in defendant's motion was not "newly discovered" in the legal sense. The court also specifically found that the evidence, if presented at trial, would probably not have produced a different result. The court further stated that it had reviewed the transcripts regarding severance and other issues addressed at trial and that it was satisfied that its prior rulings comported with the law. Thus, although the court did not specifically use the phrase "interests of justice," the record shows that the court rejected all of defendant's arguments.

We therefore conclude that the trial court did not abuse its discretion in denying defendant a new trial.

## D. Change of Venue

■ Defendant contends that the trial court erred by denying her change-of-venue motion. We disagree.

■ Denial of a change-of-venue motion is reviewed for abuse of the trial court's sound discretion. *People v. Harlan*, 8 P.3d 448, 468 (Colo.2000). A defendant is entitled to a change of venue if he or she can show either (1) the existence of "massive, pervasive, and prejudicial publicity that created a presumption that the defendant was denied a fair trial," regardless of bias disclosed in voir dire, or (2) a nexus between the jury panel and extensive pretrial publicity that created actual prejudice against the defendant, thereby denying him or her a fair trial. *Id.* at 468–69; *see also* 5 Wayne R. LaFave et al., *Criminal Procedure* § 23.2(a), at 420 (1999).

Here, defendant seeks relief under the first test only. Defendant points to extensive negative coverage in the local weekly newspaper, including one political cartoon that suggested she and Bartlett be hanged and another suggesting that a forensic audit of Bartlett would reveal "taxpayer skin under his fingernails." The weekly newspaper continued front-page coverage during the trial. There were also occasional reports in the Denver newspapers and other media, some of which included inaccurate information and allegations not at issue in the trial.

Defendant contends that this negative publicity had an especially large impact given the small size of the community and defendant's high visibility in that community. The record shows that Elbert County had a population of less than 23,000 people at the time of trial and that the local weekly newspaper distributed approximately 2800 copies each week, equivalent to less than 13% percent of the county's population. Defendant attached approximately 90 newspaper articles to her motion, but the vast majority related to issues in the school district generally, and only a handful related to the indictments or court proceedings involving defendant.

Jury selection began with a venire of approximately 180 people. After several members of the venire were excused for statutory

reasons unrelated to the change-of-venue motion, the rest completed written questionnaires designed to assess their suitability for jury duty, including potential bias. The parties reviewed the questionnaire responses over the weekend and agreed to excuse 75 to 80 people as "obvious" challenges for cause. Over the course of one and one-half days, the court and parties then conducted voir dire examination of the remaining 95 prospective jurors, including individual examinations of 55 prospective jurors outside the presence of the rest of the venire.

Defendant asserts that the jury pool was so tainted by pretrial publicity and by personal connections to the case that it was presumptively impossible for her to have a fair trial in Elbert County. In assessing this claim, we compare the facts in this case to those in a leading Colorado supreme court change-of-venue case involving a small community, *People v. Botham*, 629 P.2d 589 (Colo.1981).

*Botham* involved a notorious quadruple murder in the Grand Junction area. Grand Junction had a daily newspaper, to which approximately 70% of the residents of the county subscribed. *Id.* at 597. The newspaper published approximately 100 articles specifically related to the case, including the arrest, "[e]very step of the investigation," *id.*, gory and detailed descriptions of the corpses, and reports from the district attorney and police concerning details of the investigation and the collection of evidence. *Id.* at 597–99. Similar coverage was carried on local television and radio newscasts until the time of trial. *Id.* at 599–600. Thirteen of the fourteen jurors finally seated to hear the case had been exposed to pretrial publicity, all fourteen possessed detailed knowledge of the crime, and seven of the jurors believed at one time or another that the defendant was guilty. *Id.* at 600.

Despite these facts, the supreme court concluded that this was not a case where there was such massive, pervasive, and prejudicial publicity that the denial of a fair trial could be presumed. *Id.* at 597. (The court did find actual prejudice on the jury seated, *id.* at 600, but defendant here does not make such an argument.)

The record in the present case shows that pretrial publicity was much less extensive. The principal source of the publicity was the county's weekly newspaper, to which less than 13% of the population subscribed. Thus, unlike in *Botham*, there was no daily barrage of articles and broadcast news reports concerning bloody murders. The record reflects only two television reports that related to defendant, and those concerned issues that were not the subject of the indictment. We therefore conclude that the trial court did not abuse its discretion in declining to grant defendant's motion for change of venue. *See Harlan*, 8 P.3d at 468–69 (no presumption of prejudice from pretrial publicity, despite "highly inflammatory information" concerning a heinous murder contained in some sixty-four newspaper articles and extensive television coverage).

■ Defendant, however, contends that she is entitled to a new trial because of the destruction of certain juror questionnaires that she claims would have been relevant to her change-of-venue claim. Despite the trial court's order and the statutory requirement that they be retained in the record, *see* § 13-71-115(2), C.R.S.2008, courthouse personnel shredded the questionnaires of the 75 to 80 prospective jurors excused for cause based on their questionnaire responses. There is no evidence in the record that the destruction was carried out in bad faith. *See Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988) (absent bad faith, failure to preserve potentially useful evidence does not constitute a denial of due process).

■ Loss of a portion of the complete trial record does not automatically require reversal. Retrial is mandated only when an appellant can show that the incompleteness of the record visits a hardship upon him or her and prejudices the appeal. *People v. Rodriguez*, 43 P.3d 641, 642 (Colo.App.2001); *People v. Killpack*, 793 P.2d 642, 643 (Colo.App.1990). Here, defendant has not made that showing.

We note that defendant has raised the relevance of the 75–80 questionnaires for the first time on appeal. Neither defendant nor

Bartlett used these questionnaires to support their motions in the trial court during and after the trial—when they were still available. Assuming that the missing questionnaires would show that the jurors who filled them out were biased against defendant as a result of pretrial publicity, we do not accept defendant's argument. As discussed above, the pretrial publicity in this case was much less extensive than that in *Botham,* which the supreme court held was not sufficient to create a presumption that the defendant was denied a fair trial. We fail to see, and defendant has not articulated, how the missing questionnaires would have provided evidence that the publicity in this case was even more massive, pervasive, and prejudicial than the publicity in *Botham.* We therefore reject defendant's contention concerning the missing questionnaires.

### E. Prosecutorial Misconduct in Closing Argument

■ Defendant contends that the prosecution's closing argument improperly included a "golden rule" argument by reminding jurors that, as district taxpayers, they were indirect victims of defendant's actions. We disagree.

■ We evaluate a claim of improper closing argument as a whole and in light of the entire record. *People v. Knight,* 167 P.3d 147, 156 (Colo.App.2006). A criminal conviction should not be lightly overturned; improper prosecutorial comments alone cannot mandate reversal unless it is shown that, in the context of the entire trial, they amounted to prejudicial error. *See United States v. Young,* 470 U.S. 1, 11–12, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); *People v. Dunlap (Dunlap II),* 124 P.3d 780, 809 (Colo.App. 2004). An error is harmless if it does not "substantially influence the verdict or affect the fairness of the proceedings." *Knight,* 167 P.3d at 156.

■ A "golden rule" argument is one that asks the jurors to place themselves in the victim's position. *Dunlap II,* 124 P.3d at 809. Such arguments are improper in the guilt phase of a criminal proceeding because they encourage the jury to decide the case based on personal interest and emotion rather than on a rational assessment of the evidence. *See People v. Dunlap (Dunlap I),* 975 P.2d 723, 758–59 (Colo.1999).

Near the end of its closing argument, the prosecution in this case improperly asked the jurors to think of themselves as taxpayer victims:

> This is a very serious and very important matter to all of us, to you as citizens, to them as defendants, to the people of the State of Colorado. Think about that when you think about your tax money in this district. If the—

Bartlett's counsel immediately objected and the trial court told the jury to disregard the statement. The prosecution responded, "Well, there is no dispute that it's tax money that supports this district." Bartlett again objected, but this objection was overruled. The court ordered a recess after the prosecution finished its closing argument. While outside the presence of the jury, Bartlett asked the court for a mistrial or to strike the second statement on the ground that it, combined with the immediately preceding improper statement, also amounted to a golden rule argument. Defendant's counsel joined in the objection and motion to strike, but did not request a mistrial. The court denied the motions, holding that the prosecution needed to establish that tax money was involved as an element of the crime of embezzlement.

Defendant argues that the jury could not help but consider the two statements together despite the court's curative instruction. The second statement, she contends, served only to reinforce the first in the jurors' minds and thus revived the improper "golden rule" argument.

Although the issue has not been addressed in Colorado, many jurisdictions recognize the impropriety of a "golden rule" argument that appeals to jurors as taxpayers. *See United States v. Palma,* 473 F.3d 899, 902 (8th Cir. 2007) ("Remarks invoking the individual pecuniary interests of jurors as taxpayers are universally viewed as improper."); *United States v. Blecker,* 657 F.2d 629, 636 (4th Cir.1981) ("appeals to the pecuniary interests of jurors [as taxpayers] are patently improper").

Here, for the prosecution in this case to remind jurors of their pecuniary interest in the school district was certainly inappropriate. We cannot say, however, that those remarks rose to the level of prejudicial error. The jurors knew they were taxpayers and that their tax money was at issue. Defendant does not allege any other prosecutorial misconduct during closing argument, and this comment was an isolated portion of the prosecution's closing. Taken in light of the record as a whole, it is unlikely that this comment substantially influenced the verdict. We therefore conclude that the trial court did not abuse its discretion in refusing to grant a mistrial or strike the second statement. *See Palma*, 473 F.3d at 902.

### F. Cumulative Error

■ "[N]umerous formal irregularities, each of which in itself might be deemed harmless, may in the aggregate show the absence of a fair trial, in which event a reversal would be required." *Oaks v. People*, 150 Colo. 64, 66–67, 371 P.2d 443, 446 (1962). Although we have concluded that certain formal irregularities occurred during trial, we conclude, subject only to the discussion below of the right to post-trial counsel, that the cumulative effect of these errors did not substantially prejudice defendant's right to a fair trial. *See People v. Roy*, 723 P.2d 1345, 1349 (Colo.1986).

### G. Right to Post–Trial Counsel

Defendant contends that the trial court violated her Sixth Amendment and statutory right to counsel when it failed to inquire into her financial condition and failed to appoint the public defender to represent her in post-trial proceedings. We conclude that a remand for further proceedings on this issue is necessary.

#### 1. Background

Prior to and throughout the trial, defendant was represented by private, retained counsel. The jury verdicts were returned on March 22, 2004. In a letter dated April 16, 2004, defendant advised the court that she had exhausted her resources and wished to have counsel appointed to represent her in post-trial proceedings. Defendant explained that she had been unemployed for seventeen months, could not find a job, and was fighting cancer. Defendant also explained that she and her attorney had decided two days after trial that, "due to [her] financial situation," defendant should apply for representation by the public defender. Defendant stated that the public defender was unable to represent her until her retained counsel withdrew, but that counsel still had not filed a motion to withdraw as of that date. Defendant also made numerous complaints regarding her counsel's representation of her at trial and counsel's failure to file a motion for new trial by the court-ordered deadline.

Counsel filed a motion to withdraw on May 4, 2004, citing an irreconcilable conflict with defendant. At a hearing on the motion to withdraw on June 1, 2004, the court stated that it would not grant a withdrawal based on "the fact that [defendant] may not have satisfied all of [counsel's] financial considerations." Counsel clarified that her request to withdraw was not based on finances and that "payment was not the factor for [her] filing the motion to withdraw. It had to do with being able to hire investigators, et cetera." Counsel further stated that the motion to withdraw was not motivated by nonpayment of fees but by "irreconcilable differences and lack of trust between attorney and client."

Defendant confirmed that, "putting the money aside," she would still want counsel to withdraw. Defendant also reiterated, however, that she had initially assented to counsel's withdrawal for financial reasons. Defendant stated that she now wished to proceed pro se at her sentencing hearing because counsel had not worked on her case since their conversation of March 24, 2004, and the hearing was only ten days hence. The court nevertheless ordered counsel to continue to represent defendant through sentencing.

A hearing on defendant's and Bartlett's motions for new trial and on sentencing was held on June 11, 2004. Prior to argument on these issues, the court excused defendant's retained counsel, without determining whether good cause existed for doing so, and offered defendant more time to retain new counsel. Defendant declined the offer, stat-

ing that it would make no difference because the public defender had rejected her application and she had no funding to hire counsel. The following exchange occurred:

> THE COURT: Was the issue concerning the public defender the fact that you had assets that put you outside of their guidelines?
>
> DEFENDANT: Your Honor, they told me that because I technically still own a home even though it is in foreclosure, I drive a Cadillac Escalade, and I did not qualify.

The court made no further inquiry regarding defendant's financial condition.

Appearing pro se, defendant presented arguments on the motion for new trial and on sentencing. The court denied both defendant's and Bartlett's motions for new trial and sentenced each defendant to six years in the Department of Corrections.

### 2. Analysis

#### a. Constitutional and Statutory Right in Post-trial Proceedings

■ Defendants have a constitutional right to the assistance of counsel at all critical stages of trial. U.S. Const. amends. VI, XIV; Colo. Const. art. 2, § 16; *Iowa v. Tovar*, 541 U.S. 77, 80–81, 124 S.Ct. 1379, 158 L.Ed.2d 209 (2004); *People v. Roybal*, 618 P.2d 1121, 1126 (Colo.1980). A critical stage is one "where there exists more than a 'minimal risk' that the absence of the defendant's counsel might impair the defendant's right to a fair trial." *Key*, 865 P.2d at 825. A sentencing hearing is a critical stage of a criminal proceeding. *See People v. Wallin*, 167 P.3d 183, 190 (Colo.App.2007); *People v. Duke*, 36 P.3d 149, 152 (Colo.App.2001).

Although the Supreme Court has not addressed the issue, many circuit courts of appeals have held that the period for filing a motion for new trial is also a critical stage. *See, e.g., Kitchen v. United States*, 227 F.3d 1014, 1019 (7th Cir.2000) (right to counsel applies at every stage where "substantial rights may be affected," including prosecution of motion for new trial before decision in direct appeal); *Williams v. Turpin*, 87 F.3d 1204 (11th Cir.1996); *Robinson v. Norris*, 60 F.3d 457, 458 (8th Cir.1995); *Johnston v. Mizell*, 912 F.2d 172, 176 (7th Cir.1990); *Menefield v. Borg*, 881 F.2d 696, 699 (9th Cir.1989); Jonathan G. Neal, Note, *"Critical Stage": Extending the Right to Counsel to the Motion for New Trial Phase*, 45 Wm. & Mary L.Rev. 783, 813 (2003). Some federal circuits have held that the right to counsel does not attach to motions for new trial. *See United States v. Tajeddini*, 945 F.2d 458, 470 (1st Cir.1991); *United States v. Lee*, 513 F.2d 423, 424 (D.C.Cir.1975); *United States v. Birrell*, 482 F.2d 890, 892 (2d Cir.1973).

We find the reasoning in the former line of authorities persuasive. In this connection, we note that the motion for new trial in each of the cases rejecting a right to counsel was filed and decided after the first appeal of right (or after the defendant forewent a direct appeal) and was characterized by the court as a collateral attack, as to which there is no constitutional right to counsel. *See Silva v. People*, 156 P.3d 1164, 1167–68 (Colo. 2007) (holding that there is no federal or Colorado constitutional right to post-conviction counsel, but there is a limited statutory right); 3B Charles Alan Wright, Nancy J. King & Susan R. Klein, *Federal Practice and Procedure* § 736 (3d ed.2009).

■ We therefore hold that a motion for new trial filed, as here, before a judgment of conviction has entered is a critical stage of trial and that the right to counsel attaches to such proceedings.

#### b. Appointment of Counsel After Discharge of Retained Counsel

■ In Colorado an indigent defendant also has a statutory right to court-appointed counsel paid for by the state "at *every* stage of the proceedings following arrest, detention, or service of process." § 21–1–104(1)(a), C.R.S.2008 (emphasis added); *see also People v. Steinbeck*, 186 P.3d 54, 56 (Colo.App. 2007). "The determination of indigency shall be made by the state public defender, subject to review by the court." § 21–1–103(3), C.R.S.2008. A trial court's finding whether a defendant is entitled to appointed counsel is reviewed for abuse of discretion, but the

finding is subject to careful scrutiny because it also involves a fundamental constitutional right. *Nikander v. District Court,* 711 P.2d 1260, 1262 (Colo.1986); *Steinbeck,* 186 P.3d at 60.

■ When a defendant states that he or she cannot afford counsel or would like the court to appoint counsel, the court is "required to make a careful financial inquiry to determine eligibility for court-appointed counsel." *People v. Alengi,* 148 P.3d 154, 161 (Colo.2006); *see also Steinbeck,* 186 P.3d at 57 ("Before a court may require a defendant claiming indigency to go to trial without the benefit of counsel, the court has a 'duty to make a careful inquiry about the defendant's financial condition.'" (quoting *King v. People,* 728 P.2d 1264, 1270 (Colo.1986))). This rule is echoed by Chief Justice Directive 04–04(II)(D), which states that, upon receipt of the public defender's finding, "the court shall review the person's application for Public Defender, including any requests for exception to the determination of the Public Defender." Interpreting Chief Justice Directive 04–04, the *Steinbeck* division held that "'[s]hall' is a mandatory word that creates an obligation" for a trial court to "ask sufficient questions to determine for itself the issue of indigency." *Steinbeck,* 186 P.3d at 57.

■ The Sixth Amendment right to assistance of counsel includes a defendant's right to retain counsel of his or her choosing. *United States v. Gonzalez–Lopez,* 548 U.S. 140, 144, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006); *People v. Shari,* 204 P.3d 453, 460 (Colo.2009) (defendant's choice of counsel should be respected when possible); *People v. Maestas,* 199 P.3d 713, 716 (Colo.2009) (Sixth Amendment guarantees criminal defendant's right to counsel of his or her choice). Consequently, a defendant generally has the right to discharge his or her retained counsel without showing cause, so long as such discharge will not significantly disrupt judicial proceedings. *Maestas,* 199 P.3d at 716–17. A trial court has discretion to deny a defendant's motion to discharge his or her attorney if the request is untimely or is made "for improper purposes, such as attempting to delay proceedings or to 'impede [the] efficient administration of justice.'" *Id.* (quoting *People v. Mogul,* 812 P.2d 705, 708 (Colo.App.1991)).

■ An indigent defendant, however, who is represented by the public defender or other appointed counsel does not enjoy the right to have substitute counsel appointed absent a showing of good cause. *People v. Gonyea,* 195 P.3d 1171, 1173 (Colo.App.2008); *People v. Campbell,* 58 P.3d 1148, 1156 (Colo.App.2002) ("If the trial court finds good cause does not exist, it can insist that the defendant choose between continued representation by counsel and pro se appearance."). "Good cause includes a conflict of interest, a complete breakdown of communication, or an irreconcilable conflict." *Wallin,* 167 P.3d at 190.

■ Whether a defendant who becomes indigent during the course of criminal proceedings is entitled to discharge his or her retained counsel and then obtain appointed counsel is an issue of first impression in Colorado. This question was discussed extensively in the California case of *People v. Ortiz,* 51 Cal.3d 975, 275 Cal.Rptr. 191, 800 P.2d 547 (1990). There, an indigent defendant sought to discharge his retained counsel and obtain court-appointed counsel. The California supreme court held that it was error to require a defendant wishing to replace his or her retained attorney by appointed counsel to show cause why such substitution should be made. 275 Cal.Rptr. 191, 800 P.2d at 551–52. The court further stated that "it may be even more important for an *indigent* defendant to be able to discharge retained counsel" and obtain appointed counsel, because the right to effective assistance of counsel is threatened when "a defendant is forced to choose between proceeding to trial without an attorney or continuing to trial with an attorney originally hired to represent him but whom he no longer is able to pay." *Id.,* 275 Cal.Rptr. 191, 800 P.2d at 553 (emphasis added). This approach was recently adopted by the Utah Court of Appeals in *State v. Barber,* 206 P.3d 1223, 1234 (Utah Ct.App.2009) (observing that few other cases have addressed the issue).

We agree with this approach in the circumstances of this case. Given that the court approved the discharge of retained counsel and was willing to give defendant additional time to retain other counsel, her request for

appointed counsel was timely and did not interfere with the orderly processes of justice. Further, there is no indication in the record that defendant attempted to delay the proceedings; on the contrary, when the court offered her more time to retain new counsel, defendant elected to proceed immediately, citing the futility of continuing to a later date because of her inability to hire substitute counsel and the public defender's rejection of her application. *Cf. Alengi,* 148 P.3d at 157–58 (defendants requested and were granted numerous continuances of the pretrial motions hearing to retain substitute counsel before the court found they had waived their right to representation). It would, therefore, have been possible and appropriate to appoint counsel to represent defendant in posttrial proceedings if the court determined that she had become indigent.

We distinguish this situation from the more common circumstance in which an indigent defendant becomes dissatisfied with his or her appointed counsel and requests that different counsel be appointed. Several policy reasons weigh against allowing an indigent defendant already represented by appointed counsel to obtain substitute appointed counsel without cause. *See People v. Isham,* 923 P.2d 190, 193 (Colo.App.1995) (citing Professor LaFave's treatise); *see also Ortiz, supra.* First, the court is often better equipped than the defendant to choose competent counsel because it is familiar with the abilities of the attorneys available for appointment. 3 LaFave, § 11.4(a). Also, allowing an indigent defendant to choose his or her appointed counsel could result in an uneven distribution of cases among appointed attorneys, with a greater burden on the more experienced attorneys. *Id.* Moreover, judicial and administrative economy is better served by allowing courts to select counsel from an established pool or public defender system without being required to research particular attorneys' availability and competency. *Id.* In addition, "the government may reduce its costs by utilizing a public defender agency or contracting with private firms for regular representation of indigents." *Id.*

However, none of these considerations applies when a defendant first requests appointed counsel after discharge of retained counsel. Regardless of whether the request is made at the outset of criminal proceedings or at a later stage, a defendant's first request for appointed counsel triggers a duty in the court to determine whether the defendant is in fact indigent and entitled to appointment of counsel. *See Alengi,* 148 P.3d at 161; *Steinbeck,* 186 P.3d at 57. This duty and the attendant effort and cost of appointing counsel are the same no matter when the initial request is made.

Here, the record indicates that the court made only brief inquiry into defendant's financial status, and failed to review the public defender's determination that defendant was not indigent or "to make a specific finding about whether the public defender's analysis concerning claimed indigency [was] correct." *Steinbeck,* 186 P.3d at 56–57. The fact that defendant owned a home in foreclosure and a luxury sport utility vehicle is not in itself sufficient to establish nonindigency; it is possible that defendant's assets were "so heavily encumbered as to render defendant's 'ownership' little more than a mere fiction." *Nikander,* 711 P.2d at 1263. Thus, the trial court did not determine whether defendant "lack[ed] the necessary funds, on a practical basis, to retain competent counsel." *Id.* at 1262. Instead, the trial court required defendant to choose between proceeding pro se and continuing to employ private counsel, which defendant claimed she lacked the resources to do.

In summary, a defendant, whether indigent or not, is free to discharge his or her retained counsel without having to show cause, and an indigent defendant may subsequently request appointed counsel, so long as the discharge or request is not made for improper purposes and does not significantly disrupt judicial proceedings.

### c. Waiver

The People also contend that the trial court properly found that defendant voluntarily waived her right to counsel.

Whether a defendant made an effective waiver of the right to counsel is a mixed question of law and fact reviewed de novo. *Alengi,* 148 P.3d at 159; *People v. Stanley,* 56 P.3d 1241, 1244 (Colo.App.2002).

Even an express waiver requires the reviewing court to "indulge every reasonable presumption against it." *Stanley*, 56 P.3d at 1244 (citing *King v. People*, 728 P.2d 1264 (Colo.1986)); *see also People v. Arguello*, 772 P.2d 87, 93 (Colo.1989). A defendant must not be allowed to proceed pro se absent a valid waiver of the right to counsel. *Arguello*, 772 P.2d at 93. For a waiver to be effective, "the record as a whole, *including the reasons given by the defendant for not having counsel*, must show that the defendant knowingly and willingly undertook a course of conduct that demonstrates an unequivocal intent to relinquish or abandon his or her right to representation." *Alengi*, 148 P.3d at 159 (citing *King*, 728 P.2d at 1269) (emphasis added).

Here, defendant expressly told the court several times that she could not afford to continue to retain her counsel or to hire new counsel. At no time did defendant say that she did not *want* counsel. At sentencing, the court advised defendant that, if she did not request more time to find a lawyer, it would make an immediate finding that she had waived her right to counsel. As described above, defendant told the court that the issue was not time, but money. The court then found that she had knowingly and voluntarily waived her right to counsel.

■ However, a defendant cannot waive his or her statutory right to have the court review the public defender's determination of indigency. *Steinbeck*, 186 P.3d at 59. Until that review is made, we cannot know whether defendant's decision to waive counsel was truly voluntary or whether the court's failure to appoint counsel left her no other choice but to continue pro se. As another division of this court stated in *Steinbeck*, "the issue on appeal is not whether defendant knowingly and intelligently waived [her] right to counsel, but instead whether defendant was denied [her] right to court-appointed counsel." *Id.*

We therefore conclude that the trial court abused its discretion in failing to review the public defender's determination of nonindigency. We remand to the trial court to determine whether defendant's financial status at the time of her request entitled her to court-appointed counsel during post-trial proceedings. If the trial court determines that counsel should have been appointed, then defendant's sentence and the order denying her motion for a new trial shall be vacated, and post-trial proceedings shall be conducted anew. Defendant shall be entitled to representation by appointed counsel in such proceedings if the trial court determines that she remain indigent. Such counsel may raise any grounds for new trial other than those disposed of in this opinion. On the other hand, if the trial court finds that defendant was not entitled to appointed counsel, defendant's convictions shall stand affirmed, subject only to her right to appeal such finding of nonindigency. *See People v. Kelling*, 151 P.3d 650, 654–56 (Colo.App.2006) (remand required when trial court failed to inquire whether defendant was entitled to substitution of appointed counsel as requested); *see also State v. Torres*, 208 Ariz. 340, 93 P.3d 1056, 1060 (2004) (same).

### III. Conclusion

The case is remanded to the trial court for further proceedings consistent with the views expressed in this opinion.

Judge DAILEY and Judge LOEB concur.