23CA0518 Peo v Pelico-Vargas 04-16-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA0518
Larimer County District Court No. 21CR742
Honorable Laurie K. Dean, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Hageo Misael Pelico-Vargas,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE MEIRINK
J. Jones and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 16, 2026

---

Philip J. Weiser, Attorney General, Brenna A. Brackett, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Robin Rheiner, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Hageo Misael Pelico-Vargas, appeals the trial court's judgment of conviction entered on a jury verdict finding him guilty of sexual assault on a child. We affirm.

## I.    Background

¶ 2    Pelico-Vargas started sending Facebook direct messages to his cousin's daughter, M.V-V., when she was fourteen years old and he was twenty-three. The messages started out friendly but over time grew more sexual. At the time, Pelico-Vargas lived in the same trailer park area as M.V-V.

¶ 3    Shortly before M.V-V.'s fifteenth birthday, Pelico-Vargas told her that he had a surprise birthday present for her. Pelico-Vargas asked M.V-V. if they could meet up before she went to school. Pelico-Vargas picked up M.V-V. in his car and drove to a nearby park. Once he'd parked, he told M.V-V. to go into a portable bathroom located at the park. M.V-V. went into the portable bathroom, and Pelico-Vargas followed. Pelico-Vargas then tried to take off M.V-V.'s clothes. M.V-V. told Pelico-Vargas that she was nervous and that maybe they could meet up another day. Pelico-Vargas touched M.V-V.'s breasts and "private parts." He then asked her to perform oral sex on him, to which M.V-V. said no

1

because "it was gross and [she had] never done it."  Pelico-Vargas then told M.V-V., "You are going to like it, just bend down."  When describing the interaction, M.V-V. said, "[He] pretty much like kind of pushed me down toward his dick and forced me to suck it."  When M.V-V. started to gag Pelico-Vargas told her, "[D]on't be so immature."  Pelico-Vargas then attempted to perform vaginal sex.  M.V-V. testified that at that point she was shaking and told him no.  Pelico-Vargas grew frustrated, and the two left the portable bathroom.

¶ 4    At trial, M.V-V. testified to three other sexual interactions with Pelico-Vargas.  She testified that on one occasion when she was fifteen years old Pelico-Vargas entered her parents' house through the window even though M.V-V. didn't want him to come in.  M.V-V. told Pelico-Vargas that she wanted him to leave and didn't want to have sex, but Pelico-Vargas pushed her down on a bed and made her perform vaginal sex.  M.V-V. also said that on two separate occasions Pelico-Vargas "convinced and forced" her to perform oral sex on him when she met up with him to obtain marijuana that her friend had paid him for.

¶ 5    In October or November 2019, Pelico-Vargas's girlfriend at the time, Celestina Chavez, confronted M.V-V. at a family gathering. M.V-V. and Chavez went to a nearby park and discussed M.V-V. and Pelico-Vargas. In November 2019, Chavez confronted M.V-V.'s mother, E.V-V., about M.V-V. and Pelico-Vargas having sex. Chavez had Pelico-Vargas come outside during the interaction; E.V-V. tried to slap Pelico-Vargas, but he ran into his house. In January 2020, E.V-V. reported the allegations to a counselor at M.V-V.'s school, who then contacted a school resource officer (SRO).

¶ 6    Pelico-Vargas was charged with sexual assault on a child under section 18-3-405(1), (2), C.R.S. 2025; five counts of sexual assault under section 18-3-402(1)(a), C.R.S. 2021; and one count of second degree burglary under section 18-4-203(1), (2)(a), C.R.S. 2021. Before trial, the prosecution moved to dismiss one of the sexual assault counts. The prosecution dismissed another sexual assault count during trial after the prosecution's presentation of evidence.

¶ 7    At trial, Pelico-Vargas disputed when the acts occurred and claimed that they were consensual. He testified that the portable

3

bathroom incident occurred in February 2018, when M.V-V. was sixteen or seventeen years old.

¶ 8 The jury found Pelico-Vargas guilty of sexual assault on a child with applied force for the portable bathroom incident and acquitted him of the remaining three sexual assault charges and the burglary charge. Pelico-Vargas was sentenced to an indeterminate sentence of nine years to life in the custody of the Department of Corrections followed by three years of mandatory parole.

## II. Discussion

¶ 9 Pelico-Vargas contends that (1) the trial court erred by allowing the officer who initially interviewed M.V-V. to testify about which cases he refers for investigation and about M.V-V.'s credibility; (2) the prosecutor committed reversible misconduct during closing and rebuttal closing arguments; and (3) the cumulative effect of the errors deprived Pelico-Vargas of a fair trial. We address and reject each contention in turn.

### A. Corporal Downing's Testimony

¶ 10 Pelico-Vargas first contends that the trial court erred by admitting Corporal Russell Downing's testimony because his

statements (1) described a screening process suggesting that Pelico-Vargas was guilty and (2) implied that he believed M.V-V.'s version of events. We disagree.

1. Additional Facts

¶ 11    Downing testified that he met with M.V-V. at her high school after an SRO had reported a possible sex offense. Downing met with M.V-V., the SRO, E.V-V., a family liaison who was translating for E.V-V., and Downing's trainee to conduct what he referred to as a "minimal-facts interview." Downing explained the responding officer's role in these types of situations:

> [W]e conduct minimal-facts interviews on possible sexual assaults. And the purpose of a minimal-facts interview is to establish the who, what, where, and when of a case. So we establish who was involved, what occurred, when it occurred, and what happened during the incident.
>
> The purpose of that is when we take a sex assault case on the street, we get that minimal information and then we establish whether or not we think a sexual assault had occurred. If we believe it had, then we contact our on-call investigator, and we forward the case to investigations.
>
> So the reason we don't get in depth in an interview for minimal facts is so we don't further subject the victim to repeated reliving

and retelling of the incident and further trauma with both myself in that place and the investigator doing an investigation.

Downing testified that M.V-V. told him that, before her fifteenth birthday, Pelico-Vargas contacted her and asked to take her to school. She agreed, but on the way to school "they stopped at the playground . . . where the sexual assault occurred." When asked about the Facebook messages, Downing testified,

> [M.V-V.] didn't go into detail in the conversation because she said it started to make her uncomfortable, and I did not press because I could tell visibly that it was causing her a bit of distress.
>
> And in the minimal-facts — spirit of the minimal-facts interview, I made a note of that conversation for investigations to follow up, but did not delve any further into that.

Downing testified that M.V-V. started getting emotional and teary during the interview, so he "put the brakes on [his] part of the interview." Downing asked M.V-V. "if it was just touching or if it was more," and M.V-V. indicated "they had full sex."

¶ 12    After his conversation with M.V-V., Downing contacted the Larimer County Sheriff's Office and gave the on-call investigator "the brief of what had happened." The on-call investigator told

Downing that he would assign an investigator to the case. Downing didn't take part in the investigation.

¶ 13 On cross-examination, defense counsel asked Downing if he had collected any Facebook messages or followed up with M.V-V.'s school attendance record. Downing said no, because these activities weren't part of the interview process but would be something more in the "purview" of the primary investigating officer who handled the case moving forward.

### 2. Comments on a Screening Process

¶ 14 Pelico-Vargas contends that Downing's testimony implied that only credible allegations of sexual assault are referred to an investigator, indicating that law enforcement engaged in a "screening process," which suggested that Pelico-Vargas was guilty. We disagree.

### a. Standard of Review and Applicable Law

¶ 15 We review the trial court's ruling on the admissibility of evidence for an abuse of discretion. *People v. Mendenhall*, 2015 COA 107M, ¶ 60. Because this argument was unpreserved, we review any error for plain error. *People v. Penn*, 2016 CO 32, ¶ 28. "Plain error is obvious and substantial." *Hagos v. People*, 2012 CO

7

63, ¶ 14. An error is obvious if a judge should have been able to avoid it without the benefit of an objection. *People v. Randell*, 2012 COA 108, ¶ 86. An obvious error is one that contravened well-settled legal principles, a clear statutory command, or Colorado case law. *People v. Thompson*, 2018 COA 83, ¶ 34, *aff'd*, 2020 CO 72. An error is substantial if it "so undermine[s] the fundamental fairness of the trial itself . . . as to cast serious doubt on the reliability of the judgment of conviction." *People v. Pollard*, 2013 COA 31M, ¶ 43 (quoting *Hagos*, ¶ 14).

¶ 16 References to a screening process are improper because they suggest that there is additional evidence unknown to the jury that supports the defendant's guilt and reveal the witness's or prosecutor's personal opinion. *Domingo-Gomez v. People*, 125 P.3d 1043, 1052 (Colo. 2005). "When probable cause to charge a defendant is not at issue[,] . . . the prosecution's presentation of evidence about charging decisions may imply that, because of a pretrial screening process, only guilty parties are charged with crimes and thus the defendant must be guilty." *Mendenhall*, ¶ 62. Although a witness cannot testify that he believes a defendant committed the crime at issue, in some circumstances, "police

8

officers may testify about the reasons they took certain investigative steps, even where this testimony touches upon prohibited subjects." *Penn*, ¶¶ 31-32.

### b. Analysis

¶ 17 Here, Downing didn't refer to a screening process. Rather, he explained the process for a minimal-facts interview and that the interview's purpose was to establish "who was involved, what occurred, when it occurred, and what happened during the incident." After the "minimal information" was collected, Downing testified that the next step was to "establish whether or not we think a sexual assault had occurred"; if so, the case would be forwarded to an investigator.

¶ 18 Downing explained that his role as the responding officer was to gather basic information and assess whether further investigation is necessary. He didn't describe a charging decision or a screening process that weeds out cases based on the strength of the evidence. *See People v. Trujillo*, 2018 COA 12, ¶ 42. He simply described the steps involved with collecting information and referring a case for investigation. *Cf. Mendenhall*, ¶ 63 (concluding that an investigator's statements about how many cases he receives

and how many of those cases resulted in charges constituted inadmissible evidence).

¶ 19 Likewise, Downing's testimony was limited to minimal information that he collected during M.V-V.'s interview and didn't hint about evidence unknown to the jury or that Downing believed Pelico-Vargas was guilty. *See Domingo-Gomez*, 125 P.3d at 1052 (the prosecutor's statements — "There is a screening process for charging cases, and it takes a lot more than somebody saying that person did it" and "It takes the type of evidence that we have here" — were improper (emphasis omitted)). Downing testified that after he finished his interview, he referred the matter to the Sheriff's Office and that he had no further involvement with the case.

¶ 20 Accordingly, the court didn't err, let alone plainly err, by allowing Downing's testimony.

### 3.  Credibility of M.V-V.

¶ 21 Pelico-Vargas argues that Downing's testimony impermissibly bolstered M.V-V.'s credibility because unless Downing believed M.V-V.'s allegations, he wouldn't have referred her case for investigation. We disagree.

### a. Standard of Review and Applicable Law

¶ 22    As mentioned, we review the trial court's ruling on the admissibility of evidence for an abuse of discretion. *Mendenhall,* ¶ 60.

¶ 23    Witnesses cannot testify that another witness told the truth on a particular occasion. *Venalonzo v. People,* 2017 CO 9, ¶ 32. But "a detective may testify about his or her assessments of interviewee credibility when that testimony is offered to provide context for the detective's interrogation tactics and investigative decisions." *Davis v. People,* 2013 CO 57, ¶ 19.

### b. Analysis

¶ 24    Pelico-Vargas argues that Downing's statements implied that he believed that M.V-V. was telling the truth. We are unpersuaded. Downing's testimony didn't convey his opinion that Pelico-Vargas was guilty or that M.V-V. was credible. Rather, his statements explained the minimal-facts interview process and M.V-V.'s description of events. The prosecutor didn't ask Downing to opine on M.V-V.'s truthfulness. Downing's statements merely provided context for his involvement in the interview process and the steps a responding officer takes when a sexual assault is reported.

¶ 25    Additionally, Downing's testimony was too attenuated from any inference he believed M.V-V. was credible. Downing testified that based on the information that he gathered from M.V-V., he forwarded on her case for *investigation*. To conclude from that testimony that Downing believed M.V-V. was credible, a juror would have to infer that, based on the minimal information provided, (1) Downing believed M.V-V. was telling the truth (rather than that he believed the events as she recounted them amounted to a sexual assault), and (2) Downing believed that a sexual assault occurred and that M.V-V. was the victim. That is too much of a stretch. *See Penn*, ¶ 40 ("To reach [the conclusion that the officer was opining on K.H.'s credibility] based on the officer's statement that he had 'reason to arrest' Penn, the jury would have to infer that [the officer] both relied on K.H.'s statement *and* that he was arresting Penn because he subjectively believed that K.H. was telling the truth."). Because Downing's testimony concerned his investigatory steps during the interview process and his statements didn't indicate his opinion about M.V-V.'s truthfulness or Pelico-Vargas's guilt, the court didn't err by allowing Downing's testimony.

## B.     Prosecutorial Misconduct

¶ 26     Pelico-Vargas contends that the prosecutor committed reversible misconduct by impermissibly appealing to the jury's emotions and sympathy for M.V-V.  We disagree.

### 1.     Additional Facts

¶ 27     During voir dire, the prosecutor asked prospective jurors what emotions they might anticipate a witness or named victim to experience when testifying before a room of strangers.  Prospective jurors answered that the individual might be "very distraught," "very emotional," "very fearful," "very nervous and panicked," "ang[ry]," and "relie[ved] being able to tell the story."  Defense counsel didn't object to the question or the answers.

¶ 28     During closing, the prosecutor made the following remarks:

> [A]fter multiple years of this sexual abuse by the defendant, [seventeen-] year-old [M.V-V.], quiet, shy, timid [M.V-V.] was confronted by the defendant's angry, crying, intoxicated adult girlfriend accusing [M.V-V.] of having an affair with the very adult family member who had been sexually abusing her.
>
> . . . .
>
> We talked in jury selection about why a victim of child sexual assault might not report it right away, might not report it at all.  We talked about how you are going to hear testimony

from [M.V-V.] about the shame, the embarrassment, confusion, and fear that she felt starting when she was [fourteen] years old during this first incident . . . .

. . . .

She regretted letting him drive her to school. He was the adult family member telling her what to do, sending her private sexual messages over the Internet, telling her that he had a birthday present for her, asking her if he could pick her up and drive her to school when no one else was around. He was the one who took advantage of her quiet, timid demeanor.

. . . .

She internalized shame around her own body because of what he did to it.

. . . .

She was living in fear. She was avoiding her own family events because of this defendant's repeated sexual abuse of her.

Defense counsel didn't object to any of these statements.

¶ 29    During defense counsel's closing, he reiterated the defense's theory of the case — that M.V-V. and Pelico-Vargas had a "fully consensual, completely legal sexual relationship" and that the encounters occurred when M.V-V. "was over the age of [fifteen]." Defense counsel argued that M.V-V. didn't provide a specific day when the encounters occurred, only a three-week window, while

Pelico-Vargas "maintained all along" that the sexual conduct occurred when M.V-V. was between sixteen and seventeen years old in February 2018. Defense counsel further highlighted that M.V-V.'s original written statement and her forensic interview didn't include allegations of assault in exchange for marijuana. Defense counsel also argued that M.V-V.'s story was inconsistent because the marijuana exchange allegations were new details that she didn't include in her original statements. Defense counsel then said,

> [Chavez] acknowledged, yes, I was making an assumption that [carne asada] referred to a sexual act, but, come on, this was referring to a sexual act. If we are to believe the theory of the prosecution that this was indeed just a late-night cookout, then I guess [M.V-V.] is inviting over someone who had sexually assaulted her before her birthday, inviting him over to her home so she can make him food. That doesn't make sense either.
>
> What makes sense and what was happening is two people were engaging in a consensual sexual relationship that they did not want anyone else to know about. That's why nothing was said when any of these acts originally occurred. That's why initially, when confronted by other individuals, they denied it or minimized it, and that's why code words and innuendoes and things like that were used.

¶ 30    Defense counsel argued that the first time M.V-V. "said anything other than this was a consensual relationship was when she spoke to her school counselor in January of 2020." According to defense counsel, M.V-V.'s memory was "riddled with inaccuracies and changes at a moment's notice."

¶ 31    During rebuttal closing, the prosecutor said,

> [M.V-V.] explained to you why she made the decisions that she did. Think about that explanation. Think about what she was going through when you consider why she initially reported just the initial two incidents and then later was able to be forthcoming and tell you all about what happened in the incidents in the car as well.
>
> . . . .
>
> When you are weighing out all of the evidence that you have heard over the course of this trial, consider which makes more sense; that [M.V-V.], who had to relive the most intimately horrific moments of her young life in front of a room full of strangers, in front of her abuser, that she didn't remember a few of the details, that she had a hard time being forthcoming about each of these incidents, especially the ones where she blamed herself so much for putting herself in a position where the defendant took advantage and again sexually assaulted her because she wanted marijuana, or that the defendant, who testified today about completely new information even just from direct examination to cross-examination,

whether it makes more sense that suddenly on the day that he testifies in his own trial, suddenly he would have a date, almost a date specific that now suddenly he knows is when the incident in the porta-potty took place, and that it just so happens to be when [M.V-V.] would have been [sixteen] years old, now that he understands what the laws are that are — that make up the counts that he is facing, especially Count 1, that sexual assault on a child.

### 2. Standard of Review and Applicable Law

¶ 32    We apply a two-step analysis to prosecutorial misconduct claims. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). First, we determine whether the prosecutor's conduct was improper based on the totality of the circumstances. *Id.* Second, we determine if any improper conduct warrants reversal under the applicable standard of reversal. *Id.*

¶ 33    In determining whether the statements were improper, we review for an abuse of discretion. *People v. Lovato*, 2014 COA 113, ¶ 58. If we determine that any of the statements were improper, we apply the plain error standard — because counsel didn't object — and reverse only if the error "so undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction." *Penn*, ¶ 28 (quoting

*Hagos*, ¶ 14). Prosecutorial misconduct rarely constitutes plain error, *People v. Rhea*, 2014 COA 60, ¶ 43, and only does if it is "flagrantly, glaringly, or tremendously improper," *People v. Walker*, 2022 COA 15, ¶ 28 (quoting *People v. Dominguez-Castor*, 2020 COA 1, ¶ 86).

¶ 34     Claims of improper closing argument are evaluated as a whole in light of the entire record. *People v. Munsey*, 232 P.3d 113, 123 (Colo. App. 2009). Prosecutors have wide latitude during closing argument. *People v. Fortson*, 2018 COA 46M, ¶ 58. But they "may not pressure jurors by suggesting that guilty verdicts are necessary to do justice for a sympathetic victim." *People v. McBride*, 228 P.3d 216, 223 (Colo. App. 2009). Nor may a prosecutor "induce the jury to determine guilt based on passion or prejudice." *People v. Romero*, 2015 COA 7, ¶ 43. A prosecutor's closing statements "must refrain from making arguments 'which would divert the jury from its duty to decide the case on the evidence.'" *People v. Carian*, 2017 COA 106, ¶ 56 (quoting *Domingo-Gomez*, 125 P.3d at 1049). "Golden rule" arguments — which ask the jurors to place themselves in the victim's position — are improper because they encourage the jury to decide the defendant's guilt based on emotion

or personal interest rather than an assessment of the evidence. *Munsey*, 232 P.3d at 123.

### 3. Analysis

¶ 35 Pelico-Vargas argues for the first time on appeal that the prosecutor's closing and rebuttal improperly appealed to the jurors' sympathy for M.V-V. Specifically, he argues that the prosecutor's statements implored the jurors to find M.V-V.'s testimony more credible because of what Pelico-Vargas "put her through" and what M.V-V. felt during the alleged years of abuse. However, the statements during closing were anchored in the evidence presented during trial. M.V-V.'s friend testified that M.V-V. was quiet and shy, and the statements about what M.V-V. was feeling were directly from M.V-V.'s testimony that she regretted meeting up with Pelico-Vargas, she avoided family gatherings because she didn't want to see him, and she wished that her body was different. *Cf. People v. Manyik*, 2016 COA 42, ¶¶ 32-34 (holding that the prosecutor committed misconduct during opening statement by giving a first-person narrative of a homicide victim because the statements were not references to evidence that would be

introduced during trial and constituted the prosecutor's personal opinion about what the victim would say if he testified).

¶ 36 Further, these statements didn't ask the jury to do justice for M.V-V. and decide the case based on sympathy rather than evidence. *Cf. People v. Buckner*, 2022 COA 14, ¶¶ 41-42 (The court concluded that the prosecutor's "plea for justice" before deliberations to be improper when the prosecutor said that the "[victim's] day of justice is a long time coming. That's today. Hold him accountable for what he did to that girl that night."). The prosecutor's closing argument focused on the evidence presented at trial, each count that Pelico-Vargas was charged with, and witness testimony relating to each count. The prosecutor indicated that the jury determines the credibility of the witnesses and that, based on the evidence, the People had proved the charges beyond a reasonable doubt.

¶ 37 Additionally, the prosecutor's closing rebuttal arguments centered on the evidence presented at trial and responded to defense counsel's closing arguments. Defense counsel highlighted that M.V-V. made the marijuana exchange allegations after the original sexual assault allegation and that M.V-V. gave a three-week

20

window but didn't know an exact date when the first assault occurred. The prosecutor's request to "[t]hink about what she was going through when you consider why she initially reported just the initial two incidents" was in response to defense counsel's argument about M.V-V.'s change of story, not an appeal to the jury's sympathy for M.V-V. It asked the jurors to consider the evidence presented during M.V-V.'s testimony about why she was not initially forthcoming.

¶ 38    Additionally, the prosecutor's statements about "what makes more sense," describing that M.V-V. had to talk about the most "horrific moments" of her life and that she "blamed herself" for putting herself in that position, were in response to defense counsel's closing argument about the inconsistency and lack of specificity in M.V-V.'s testimony. These statements also responded to defense counsel's closing argument about "what makes sense," why the allegations were not initially reported, and why M.V-V.'s memory was "riddled with inaccuracies." The prosecutor's statements reiterated the initial closing argument as to M.V-V.'s actions and why those actions didn't discredit her account of events. *See People v. Welsh*, 176 P.3d 781, 788 (Colo. App. 2007) (A

prosecutor "may draw reasonable inferences from the evidence as to the credibility of witnesses."). Additionally, the prosecutor's last comment to the jury before deliberations reiterated that it was the jury's role to consider and weigh all the evidence and didn't suggest that the jury should decide the case on other grounds.

¶ 39   Pelico-Vargas argues nevertheless that the prosecutor's closing and rebuttal arguments were a continuation of the prosecutor's voir dire, "which invoked a type of 'golden rule' sentiment." But the prosecutor didn't ask jurors to imagine themselves in the victim's place. Rather, the statements during closing and rebuttal discussed M.V-V.'s emotions and the impacts of the alleged sexual contact on her. *Cf. People v. Dunlap*, 124 P.3d 780, 809 (Colo. App. 2004) (holding that the prosecutor's questions to the jury — "Would you want to be moved, particularly in the way [the victim] was, with a gun touching your right temple? Do you think you would feel that your risk of harm was being substantially increased?" — were improper). Accordingly, the challenged statements weren't "golden rule" arguments.

## C. Cumulative Error

¶ 40    Pelico-Vargas contends that the claimed errors collectively prejudiced his substantial rights and therefore require reversal. Cumulative error applies when multiple errors in the aggregate prejudiced the defendant's substantial rights. *Howard-Walker v. People*, 2019 CO 69, ¶ 25. Under the cumulative error doctrine, multiple errors must have occurred. *People v. Daley*, 2021 COA 85, ¶ 141. Because we haven't identified multiple errors, the cumulative error doctrine does not apply.

## III. Disposition

¶ 41    We affirm the judgment of conviction.

JUDGE J. JONES and JUDGE LUM concur.