The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
September 5, 2019

**2019COA140**

**No. 18CA0032, *People v. Vidauri* — Crimes — Theft; Health and Welfare — Public Assistance Benefits — Medicaid**

In this theft of public benefits case, a division of the court of appeals concludes that because the prosecution presented only evidence showing the total amount of benefits paid rather than the total amount of benefits to which Alma Vidauri may have been eligible, it failed to prove the value of the benefits which Vidauri obtained by deceit. Therefore, the division reverses the conviction for felony theft, but otherwise affirms.

COLORADO COURT OF APPEALS                                    **2019COA140**

Court of Appeals No. 18CA0032
Garfield County District Court No. 16CR3023
Honorable James B. Boyd, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Alma Vidauri,

Defendant-Appellant.

JUDGMENT AFFIRMED IN PART, REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE WEBB
Furman and Brown, JJ., concur

Announced September 5, 2019

Philip J. Weiser, Attorney General, Brenna A. Brackett, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

The Noble Law Firm, LLC, Antony Noble, Taylor Ivy, Lakewood, Colorado, for
Defendant-Appellant

¶ 1    After hearing evidence that Alma Vidauri had significantly understated her household income, a jury convicted her of one count of class 4 felony theft — $20,000 to $100,000 — and three counts of forgery in connection with her three applications for and receipt of Medicaid and Child Health Plan Plus (CHP+) benefits. Addressing a novel question in Colorado, we conclude that because the prosecution presented only evidence showing the total amount of benefits paid, it failed to prove the value of the benefits which Vidauri obtained by deceit.  So, we reverse the conviction for felony theft.  On remand, the trial court shall enter a judgment for class 1 petty theft.  In all other respects, we affirm.

## I.  Background

¶ 2    According to the prosecution's evidence, Vidauri submitted three applications for medical assistance benefits to the Garfield County Department of Human Services (Department) between 2008 and 2011.  Based on these applications, she and her children received a total of $31,417.65 in benefits.  But Vidauri understated her household income.

¶ 3    When Vidauri submitted her initial application in 2008, she was living with her first child and was pregnant with her second.

1

On this application, Vidauri reported approximately $800 of monthly income from a housekeeping job. The income verification letter that Vidauri provided said that she was working for her soon-to-be mother-in-law. After the Department approved this application, Vidauri and her child started receiving Medicaid benefits.

¶ 4    In 2009, Vidauri married Jose Erick Rascon, the father of her second child. He was employed. But she did not promptly report his income to the Department.

¶ 5    Vidauri submitted her second application in March 2011, when she was pregnant with her third child and married to Rascon. She reported that her employment had ended and she was not earning any income. The Department denied her Medicaid benefits because of the income that she had reported for her husband, but approved Medicaid benefits for her older child and CHP+ benefits for the younger child.

¶ 6    Vidauri submitted her last application in October 2011, after the birth of her third child. On this application, Vidauri reported that her husband's hours had been reduced. She denied that

anyone in her household was self-employed. The Department approved all three children for Medicaid benefits.

¶ 7     The following year, Vidauri submitted two handwritten statements to the Department explaining that her husband's employment had ended but that she was earning approximately $720 per month. The Department continued paying for Medicaid benefits for all three children.

¶ 8     From 2013 to 2016, the Department automatically re-enrolled Vidauri's children in Medicaid based on the financial information that she had provided in 2012. During that period, the Department sent Vidauri five redetermination notices that directed her to report any changes to her household's income. She did not report any changes.

¶ 9     In 2016, Cora Louthan, a Department fraud investigator, questioned Vidauri about the financial information in her applications. Vidauri brought Louthan additional information including tax returns, bank statements, and utility bills. These documents, together with information gleaned from public sources, showed that since 2006 Vidauri had owned her own housecleaning business, since 2012 her husband had owned his own electrical

3

contracting business, and each owned significant property, none of which had been disclosed to the Department. At trial, Louthan — whom the trial court allowed to testify as an expert witness — opined that the applications did not accurately describe the financial state of Vidauri's household. But Louthan could not, or at least would not, opine on the amount of benefits — if any — to which Vidauri would have been entitled had her applications been accurate. Nor did Louthan testify that an inaccurate application forfeited all rights to benefits.

¶ 10    On appeal, Vidauri raises four contentions.

- The evidence was insufficient to sustain any of the convictions.

- The trial court admitted improper expert testimony of Louthan.

- The prosecutor engaged in misconduct during voir dire, witness examination, and closing argument.

- Cumulative error requires reversal.[1]

¶ 11    The Attorney General concedes that Vidauri preserved two insufficient evidence issues related to the theft conviction and

---

[1] Vidauri does not address the effect of a partial reversal on the restitution award.

improper burden-shifting by the prosecutor. He disputes preservation of her remaining insufficiency contentions, admission of improper expert testimony, and any other alleged prosecutorial misconduct.

## II. Sufficiency of the Evidence

¶ 12 Whether the record contains sufficient evidence to support a conviction is subject to de novo review; if the evidence is insufficient, we reverse regardless of whether the defendant preserved the argument below. *See McCoy v. People*, 2019 CO 44. An appellate court must decide whether the prosecution presented evidence sufficient in both quantity and quality to sustain the defendant's conviction. *See, e.g.*, *People v. Lybarger*, 700 P.2d 910, 916 (Colo. 1985). The court considers "whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt." *Clark v. People*, 232 P.3d 1287, 1291 (Colo. 2010) (quoting *People v. Bennett*, 183 Colo. 125, 130, 515 P.2d 466, 469 (1973)).

¶ 13    Two principles bookend the analysis.  On the one hand, a criminal conviction may not be based on guessing, speculation, and conjecture.  *People v. Gonzales*, 666 P.2d 123, 128 (Colo. 1983).  But on the other, an appellate court does not sit as a thirteenth juror, reweighing the evidence.  *Id.*

## A.  Theft

¶ 14    The prosecution charged Vidauri under section 18-4-401(1)(a), C.R.S. 2018, which criminalizes obtaining anything of value by deceit with the intent to permanently deprive another of its value.  Vidauri contends the prosecution failed to present evidence sufficient to prove her intent or to establish the value of the purportedly stolen benefits.  We reject her first contention but agree with her second contention.

### 1.  Law

#### a.  Intent

¶ 15    A fact finder may infer a defendant's intent to permanently deprive another of use or benefit from the defendant's conduct and other circumstances of the case.  *People v. Stewart*, 739 P.2d 854, 856 (Colo. 1987).  An intent to deprive can be found even when a victim has authorized the defendant to use the thing of value if the

6

authorization was obtained by deceit. *Id.* A party is presumed to know the contents of a document that the party signs. *B & B Livery, Inc. v. Riehl*, 960 P.2d 134, 138 n.5 (Colo. 1995).

### b. Gradation of Theft Offenses by Value

¶ 16 The value of the thing stolen determines the grade of the offense. § 18-4-401(2). Value is a sentence enhancer, not an element of the offense. *People v. Simpson*, 2012 COA 156, ¶ 14. Still, due process requires the prosecution to prove value beyond a reasonable doubt. *People v. Jamison*, 220 P.3d 992, 993 (Colo. App. 2009). The prosecution meets this burden by presenting sufficient evidence of the value of the thing stolen at the time of the offense. *People v. Jaeb*, 2018 COA 179, ¶ 40.

¶ 17 Although section 18-4-414, C.R.S. 2018, addresses proving retail value, neither the theft statute nor any Colorado case explains how the prosecution proves the value of public assistance benefits obtained as a result of a defendant's deceit. If the prosecution presents sufficient evidence of theft but not value, the case must be remanded for entry of judgment for a lesser level offense. *People v. Codding*, 191 Colo. 168, 169-70, 551 P.2d 192, 193 (1976). And if the prosecution presents no evidence of value, the conviction

defaults to lowest level, class 1 petty theft.  *Jaeb*, 434 P.3d at ¶¶ 44, 51.

## 2.  Application

¶ 18     We begin with intent because insufficient evidence would require reversal; failure to prove value requires only a downgrade.

### a.  Proof of Intent

¶ 19     The prosecution presented documentary and testimonial evidence from which a reasonable juror could conclude that Vidauri understood the importance of accurately reporting changes to her income and household composition.  She attested that each application was true and accurate.  Each application included a statement that Vidauri was to report all changes in income to the Department within ten days.  She never did so.

¶ 20     Given that the Department reduced her benefits in response to her husband's income that she declared on the second application, a reasonable juror could have concluded that Vidauri intended to obtain benefits to which she was not entitled when, on the third application, she declared that her husband's hours had been reduced.  The same objective could be inferred from Vidauri's

8

decision in 2012 to tell the Department that her husband's employment had ended in response to the redetermination notice.

¶ 21    Each time that Vidauri was required to verify her household income, she did so. For example, she submitted pay stubs along with all three benefit applications, and bank statements for both 2011 applications. But she did not tell the Department that she had gotten married in 2009, which may have affected her second child's Medicaid eligibility. On the third application, Vidauri said that no one in her household was self-employed. But her 2011 and 2012 tax returns show $17,314 and $30,896 of net income respectively from her housecleaning business.

¶ 22    The prosecution's evidence also included notices that the Department had mailed to Vidauri every year beginning in 2012, each of which asked her to update her household income information. In response to the 2012 notice, Vidauri faxed the Department two statements. One said that her husband was no longer working for the employer that Vidauri had reported on her third benefits application. But Vidauri failed to say that her husband had started his own business the month before. The second statement said that she was earning only about $720 per

month, or $8,640 per year, which is contradicted by her 2011 and 2012 tax returns. And Vidauri never told the Department that her husband's business was generating substantial income from 2012 through 2015, years during which their family continued to receive medical assistance benefits.

¶ 23    Vidauri argues that these inaccuracies and omissions could be interpreted as instances of excusable neglect or misunderstanding, especially given her limited education and that English is her second language. But a reasonable juror could also have concluded that the prosecution's evidence showed a pattern of duplicity whereby Vidauri intended to secure benefits to which she was not entitled. *See People v. Gonzales*, 2019 COA 30, ¶ 37 ("[T]he inferences drawn from [the] evidence are solely for the jury to draw, not an appellate court.").

¶ 24    Despite all of this evidence, Vidauri asserts that she could not possibly have intended to obtain benefits by deceit because she did not know exactly what information to include on her applications to "ensure eligibility[.]" But this argument would prove too much — under this theory, only a benefits eligibility specialist could defraud a public assistance program. And as indicated, ample evidence

created a reasonable inference that Vidauri understood the generally inverse relationship between income and eligibility.

### b. Proof of Value to Establish the Grade of Theft

¶ 25　The prosecution presented a claims summary report from the Colorado Department of Health Care Policy and Financing showing that, over eight years, Vidauri and her three children had received medical assistance benefits totaling $31,417.65. Vidauri never disputed the total amount of benefits received. But when Louthan was asked on both direct and cross-examination if she had determined whether Vidauri would have been eligible for any medical assistance had she accurately reported her household income, and, if so, in what amount, Louthan said that she had not made either determination.

¶ 26　Importantly, the prosecutor did not introduce any evidence to establish the value of benefits to which Vidauri would have been entitled had she fully disclosed her household income. Nor did he offer evidence that any fraud in the application process results in a total forfeiture of benefits. Perhaps the prosecutor did not do so because Colorado law is silent on whether the prosecution must prove the value of public assistance benefits obtained by deceit.

11

¶ 27     Be that as it may, other states have answered this question in two ways: based on either the amount of benefits paid above those to which the defendant would have been entitled, i.e., the *overpayment* amount, or the *total* amount of benefits received, without offsetting the entitlement amount.  Unsurprisingly, the Attorney General urges us to adopt the total amount approach and affirm the theft conviction as a class 4 felony.  For her part, Vidauri advocates the overpayment approach under which, she continues, the theft conviction must be vacated.

¶ 28     After examining both lines of authority, we agree with Vidauri on the point of adopting the overpayment approach.  But because we conclude that the prosecution presented sufficient evidence for a reasonable juror to have found that Vidauri obtained *some* benefits by deceit, the conviction need only be downgraded.

¶ 29     To begin, comparing the present case to public benefits theft or fraud cases in other jurisdictions is problematic.  True, the facts of these cases are similar — a public benefits applicant understates income or fails to report the presence of additional wage earners in the household and receives benefits.  But prosecutors in other states charge these defendants under a variety of general fraud and

12

theft statutes. And in some states (not Colorado), these cases are charged under more specific public assistance fraud statutes that provide guidance on how to prove the value of benefits at issue.

¶ 30    At one end of the spectrum, in a case charged under a general theft statute involving food stamps and cash assistance, the Ohio Supreme Court adopted the total amount approach. *State v. Edmondson*, 750 N.E.2d 587 (Ohio 2001). That decision turned on the court's interpretation of Ohio statutes governing its food stamp and cash assistance programs. The Ohio regulations for the cash assistance program stated that failure to provide "necessary information" on an application for benefits would "result in a denial" of all benefits. *Id.* at 591 (interpreting Ohio Admin. Code 5101:1-2-10 (2019)). A portion of the statute concerning food stamps said that food stamps were government property "until they are received by a household entitled to receive them." *Id.* (interpreting Ohio Rev. Code 5101.54(B) (West 2019)). Based on these provisions, the court held that the defendant's "deception taints all of the [benefits] that [the state] gave to her based on her materially false application." *Id.*

¶ 31    Similarly, the Connecticut Supreme Court upheld a conviction under a general larceny statute in a case involving a defendant who had received cash assistance and medical benefits. *State v. Robins*, 643 A.2d 881 (Conn. App. 1994), *aff'd*, 660 A.2d 738 (Conn. 1995). Like Colorado's theft statute, Connecticut's larceny statute determines the grade of the offense by the value of the service. That court refused to require the prosecution to prove a lack of entitlement or to quantify the overpayment amount and adopted a total amount approach, albeit without significant analysis. *Id.* at 884-85.

¶ 32    At the other end of the spectrum, the California Supreme Court required that a loss to a government agency from public benefits fraud must be calculated by subtracting the amount the government "would have paid had no acts of fraud occurred" from "the amount the government actually paid." *People v. Crow*, 864 P.2d 80, 87 (Cal. 1993). Similarly, a division of the Arizona Court of Appeals reversed a conviction under a welfare fraud statute because the prosecution had failed to present sufficient evidence of the defendant's lack of eligibility or the overpayment amount. *State v. Roberts*, 673 P.2d 974 (Ariz. Ct. App. 1983). The Arizona statute

specifically limits criminal liability for benefits "to which the person is not entitled" or "greater than that to which the person is entitled." Ariz. Rev. Stat. § 46-215(A)(1), (2) (2019).

¶ 33    A few cases occupy the middle ground.  For example, an appellate division of the New York Supreme Court upheld a conviction for grand larceny in a welfare fraud case where the state based the grade of the offense on proof of the overpayment amount. *People v. Stumbrice*, 599 N.Y.S.2d 325, 327-28 (N.Y. App. Div. 1993).  Although New York's grand larceny statute was silent on how a court should value medical and food assistance benefits, the prosecution presented undisputed evidence that if the defendant had reported her husband's income, her household would have been ineligible for $17,938.97 of the $21,231,23 it received.  *Id.* at 327.

¶ 34    For three reasons, we adopt the overpayment approach.

¶ 35    First, following the Ohio Supreme Court's methodology of looking to the relevant public assistance program statutes for guidance, the Colorado Medical Assistance Act adopts the overpayment approach to civil liability.  Specifically, the state may recover "any medical assistance paid to which a recipient was not

lawfully entitled," plus interest on benefits that had been fraudulently obtained. § 25.5-4-301(1)(c), (d), C.R.S. 2018. However, the statute does not create a separate crime of medical assistance fraud.[2]

¶ 36    Second, adopting the overpayment approach and placing the burden of proof on the prosecution would not impose an undue obligation on prosecutors. After all, the prosecution has unlimited access to fraud investigators and government employees who make overpayment determinations. So, a prosecutor could request such a determination to establish at trial the value of fraudulently obtained benefits, even if the determination had not been made during the investigation. By contrast, placing this burden on a

---

[2] The overpayment approach also comports with other public benefits programs in Colorado, including food stamps, cash assistance, and unemployment insurance, which deduct the legal entitlement amount from the total amount paid to determine liability for overpayment. *See* § 8-74-109(2), C.R.S. 2018 (unemployment insurance; providing that "[i]f by reason of fraud . . . a claimant receives moneys *in excess of benefits to which he is entitled* . . .") (emphasis added); § 26-2-128(1), C.R.S. 2018 (cash assistance; "[A]ny previously paid excess public assistance *to which the recipient was not entitled* shall be recoverable . . . .") (emphasis added); § 26-2-305(1)(a), C.R.S. 2018 ("Any person who obtains . . . food stamp coupons . . . *the value of which is greater than that to which the person is justly entitled* . . . commits the crime of theft . . . .") (emphasis added).

16

defendant would ignore the defendant's much more limited access to this information as well as the lack of incentive for government employees to cooperate with the defense.

¶ 37 Third, everyone would agree that where a defendant acquires *all* the benefits fraudulently, the two approaches would yield the same result. But where a defendant acquires only a portion of the benefits by deceit, the overpayment approach is consistent with the prosecution's burden to prove any fact used to justify an enhanced sentence. *People v. Kyle*, 111 P.3d 491, 501 (Colo. App. 2004) ("[A] sentence enhancement factor . . . like the substantive predicate offense, must be proved beyond a reasonable doubt."), *overruled on other grounds by Zoll v. People*, 2018 CO 70.

¶ 38 Viewing the prosecution's case through the lens of the overpayment approach, the evidence would be sufficient if the prosecutor had presented evidence that *any* misrepresentation worked a forfeiture of *all* benefits. But the prosecutor presented no such evidence. And in any event, the statutory recovery formula weighs against total forfeiture.

¶ 39 In the end, we return to the prosecutor's failure to present any evidence showing the amount of benefits obtained by deceit, i.e., the

difference between the total amount of benefits paid and the amount to which Vidauri was entitled based on her household income. *See Crow*, 864 P.2d at 87 ("[F]alsities resulting only in a small gain to the defendant could nevertheless result in a sentence enhancement in cases in which the defendant receives substantial welfare benefits, most of which would be payable regardless of the falsity. This would not implement [the Penal Code's] goal of deterring large-scale crime."). So, in applying the overpayment approach, we conclude that the prosecution did not present sufficient evidence to prove that the amount of the overpayment exceeded $20,000.

¶ 40    But did the prosecution present evidence that Vidauri obtained *any* benefits by deceit? Recall that we concluded the prosecution presented ample evidence from which a reasonable jury could have found that Vidauri intended to obtain increased benefits by understating her household income. This evidence also supports a reasonable inference that, by understating her income, Vidauri obtained increased benefits.

¶ 41    As well, Louthan testified that Medicaid and CHP+ are income-based programs, that eligibility varies based on income, and

that Vidauri received benefits that she should not have received. This testimony further supports a reasonable inference that Vidauri's understatement of her household income caused the Department to pay her benefits that she should not have received.

¶ 42     In sum, we conclude that the prosecution presented sufficient evidence of theft by deceit but no evidence of the value of benefits stolen.  The only grade of theft that does not require proof of value is a class 1 petty offense.  So, we reverse the class 4 felony theft conviction and remand for entry of judgment for class 1 petty theft.

### B.  Forgery

¶ 43     Vidauri contends the prosecution failed to present sufficient evidence to prove either that she intended to defraud the Department or that any false assertions on those applications were material.  We reject these contentions.

### 1.  Law

¶ 44     The prosecution charged Vidauri under section 18-5-102(1)(c), C.R.S. 2018, which states, "with intent to defraud, [a] person falsely . . . completes . . . a written instrument which . . . does or may . . . affect a legal right, interest . . . or status[.]"  "[F]alsely complete" includes a requirement that the false information be material such

19

that it "affects the action . . . or decision of the person who receives . . . the asserted information in a manner that directly or indirectly benefits the person making the assertion." § 18-5-101(3)(b), C.R.S. 2018. And the jury may infer intent when a defendant passes an instrument the defendant knows to be false. *People v. Brown*, 193 Colo. 120, 122, 562 P.2d 754, 755 (1977).

## 2. Application

¶ 45    Vidauri concedes that her applications were "instruments capable of having the [legal] effect." As indicated, she did not dispute the prosecution's evidence that she and her children received medical assistance benefits.

### a. Intent to Defraud

¶ 46    Like her intent argument with respect to the theft conviction, Vidauri asserts that "because no evidence established that [she] knew what information she should report or omit on her applications in order to qualify for medical assistance," the circumstantial evidence was not sufficient to prove her intent to defraud the Department. This argument misses the mark because whether Vidauri knew how much income she could report and still

be eligible for benefits — a quantitative inquiry — is irrelevant to the forgery charge.

¶ 47    Rather, the prosecution's burden is qualitative: to present sufficient evidence for a reasonable jury to find that Vidauri intentionally included false information in, or omitted material from, her applications for the purpose of misleading the Department.  And based on the same evidence from which the jury could have found that Vidauri intended to commit theft, a reasonable jury could have found that she intended to commit forgery.

### b.  Materiality

¶ 48    Next, and like her primary theft argument, Vidauri argues that the prosecution failed to prove that the allegedly false information was material because ineligibility is "a necessary condition precedent" to establishing materiality.  Although we agreed as to gradation of the theft, for materiality this argument falls short.

¶ 49    Vidauri points out what she asserts is an inconsistency in the forgery statute.  One element of forgery is a written instrument that "does *or may* . . . affect a legal right."  § 18-5-102(1)(c) (emphasis added).  By contrast, the statutory definition of "falsely complete"

requires that the false assertion "affect[]" the decision of the person who receives it. § 18-5-101(3)(b). From this purported inconsistency, Vidauri argues that because the Department never calculated the benefits to which she would have been entitled based on her actual household income, the prosecution failed to prove that the allegedly false information affected the Department's decision.[3]

¶ 50    Were we presented with a case in which a falsely completed instrument may have, but ultimately did not, affect a legal right, further inquiry into this supposed inconsistency might be required. For example, the evidence could have shown that while Vidauri submitted an application with false information, the Department approved payment of benefits without considering that information. But the evidence in this case showed more.

---

[3] We are not persuaded that the statute is inconsistent. The phrase "may . . . affect" partly defines what is an instrument, which is one element. § 18-5-102(1)(c), C.R.S. 2018. The word "affect[]" appears in the definition of materiality, which limits "falsely completes," a different element. § 18-5-101(3)(b), C.R.S. 2018. So, the General Assembly may only have intended to define the former element more broadly than the latter element.

¶ 51     Recall, we have concluded that, despite the prosecution's failure to prove an amount of overpayment, the evidence was sufficient for a reasonable jury to have found that by significantly understating her household income Vidauri affected the Department's eligibility determination. From this same evidence, a reasonable jury could have found that Vidauri's understatements were material, even using the "affect[]" rather than the "may . . . affect" interpretation.[4]

¶ 52     In short, we conclude that the prosecution presented sufficient evidence to prove the three felony forgery counts.

### III.  Expert Testimony of Louthan

¶ 53     The trial court accepted five current and former employees of the Department to testify as experts. On appeal, Vidauri focuses solely on Louthan's testimony. The court accepted her as an expert in "medical assistance benefits eligibility determinations." Vidauri argues that the court abused its discretion when it accepted

---

[4] Unlike the theft statute, where evidence of value is necessary to prove the grade of the offense, forgery is a class 5 felony regardless of the value of the benefits, if any, received by the forger. § 18-5-102(2).

Louthan as an expert witness and overruled objections during her testimony because

- she lacked the requisite qualifications;

- her testimony exceeded the scope of her expertise;

- her testimony was not helpful to the jury; and

- her testimony usurped the role the of the jury.

Vidauri also asserts that the probative value of Louthan's testimony was substantially outweighed by its unfair prejudice.

## A. Preservation and Standard of Review

¶ 54    A trial court's decision to admit or exclude expert testimony is reviewed for an abuse of discretion. *Estate of Ford v. Eicher*, 250 P.3d 262, 266 (Colo. 2011). A trial court abuses its discretion only if its ruling is manifestly arbitrary, unreasonable, unfair, or it misinterprets the law. *Huntoon v. TCI Cablevision of Colo., Inc.*, 969 P.2d 681, 690 (Colo. 1998).

¶ 55    Preserved claims are reviewed for harmless error; unpreserved claims are reviewed for plain error. *Hagos v. People*, 2012 CO 63, ¶ 12 (discussing harmless error review); *id.* at ¶ 14 (discussing plain error review); *see also Wend v. People*, 235 P.3d 1089, 1097 (Colo. 2010) (refusing to impose constitutional harmless error standard

24

broadly).  While an appellant need not use "talismanic language" at trial to preserve an argument for appeal, "the trial court must be presented with an adequate opportunity to make findings of fact and conclusions of law on any issue" for appellate review.  *People v. Melendez*, 102 P.3d 315, 322 (Colo. 2004).

¶ 56    Before trial, Vidauri moved to strike the proposed expert testimony of Louthan and the other current or former Department employees.  That motion challenged their qualifications and noted the possibility that their testimony would not help the jury, would usurp the role of the jury, and would be unfairly prejudicial under CRE 403.  At a pre-trial motions hearing, Vidauri made no further argument and the court qualified these witnesses.  It said, "To the extent there is expertise about how the [Department] rules work in terms of benefits of being eligible for them, I do think that's a legitimate topic for expert testimony, which seems to be what this generally is."

¶ 57    At trial, Vidauri objected to some of Louthan's testimony as unhelpful to the jury and exceeding her expertise.  She also objected to testimony by Louthan as expressing an improper opinion about Vidauri's credibility.  She objected to questions by

the prosecutor as improperly shifting the burden of proof to Vidauri. So, Vidauri preserved these issues.

¶ 58 The Attorney General argues that when Vidauri did not object to Louthan's qualifications at trial, she waived the claim. But because the court had already made a definitive ruling on the record, Vidauri did not need to renew her objection. CRE 103(a)(2); *Uptain v. Huntington Lab, Inc.*, 723 P.2d 1322, 1330 (Colo. 1986) (holding that when a specific evidentiary issue is presented by a motion in limine, no contemporaneous objection is necessary to preserve the issue).

## B. Law

¶ 59 CRE 702 governs the admissibility of expert testimony. The inquiry focuses on the reliability and relevance of the proffered expert testimony. *People v. Shreck*, 22 P.3d 68, 77-79 (Colo. 2001). A trial court must consider whether the testimony will be helpful to the jury and whether the witness is qualified. *Id.*

¶ 60 The bar for helpfulness is low — whether the expert can offer "appreciable assistance" on a subject beyond the understanding of a typical juror. *People in Interest of Strodtman*, 293 P.3d 123, 129-30 (Colo. App. 2011). Helpfulness "hinges on whether the

proffered testimony is relevant to the particular case: whether it 'fits.' Fit demands more than simple relevance; it requires that there be a logical relation between the proffered testimony and the factual issues" of the case. *People v. Martinez*, 74 P.3d 316, 323 (Colo. 2003).

¶ 61 A court may qualify an expert based on knowledge, skill, experience, training, or education. CRE 702. The rule does not impose a bright-line requirement that a witness hold a specific credential to testify on an issue. Rather, a court may qualify an expert witness on any of five factors listed in CRE 702. *People v. Douglas*, 2015 COA 155, ¶ 71.

¶ 62 An expert may express an opinion or inference based on the facts and data in a particular case. CRE 703. An expert's opinion that embraces an issue which the jury must decide does not affect its admissibility. CRE 704. However, an expert cannot express an "ultimate" conclusion about truthfulness of another witness's testimony. *People v. Bridges*, 2014 COA 65, ¶ 15.

¶ 63 An expert witness may present lay testimony if the lay portion satisfies the requirement of CRE 701. *See Salcedo v. People*, 999 P.2d 833, 837-38 (Colo. 2000) (allowing a police detective to testify

27

as dual-capacity witness); *see also People v. Fortson*, 2018 COA 46M, ¶ 99 ("[I]n the absence of binding appellate authority condemning [dual-capacity] testimony, it remains for the trial court to excise its discretion to control . . . such testimony . . . ."). CRE 701 permits lay testimony if the witness's opinions and inferences are rationally based on the perceptions of the witness, helpful to the jury, and not based on scientific, technical, or other specialized knowledge.

¶ 64 A trial court may allow testimony from a "summary witness" if the court determines that the evidence is sufficiently complex and voluminous that a summary would help the jury. *Murray v. Just In Case Bus. Lighthouse, LLC*, 2016 CO 47M, ¶ 31.

¶ 65 Still, relevant evidence may be excluded if a court finds that "its probative value is substantially outweighed by the danger of unfair prejudice . . . or misleading the jury." CRE 403. Unfairly prejudicial means "an undue tendency to suggest a decision on an improper basis . . . such as sympathy, hatred, contempt, retribution, or horror." *People v. Dist. Court*, 785 P.2d 141, 147 (Colo. 1990). "In weighing those dangers and considerations, the proffered evidence 'should be given its maximal probative weight

and its minimal prejudicial effect.'" *Alhilo v. Kliem*, 2016 COA 142, ¶ 9 (quoting *Murray*, ¶ 19).

## C. Application

¶ 66 We reject Vidauri's arguments that the trial court abused its discretion with respect to accepting Louthan as an expert and overruling objections to some of her testimony.

### 1. Louthan's Qualifications

¶ 67 Louthan had more than ten years of experience in public assistance administration as a case manager, benefits technician, and fraud investigator. She also had extensive training from the Colorado Department of Human Services. Vidauri argues that Louthan "possessed no academic or experience-based credentials" to justify the court's decision to qualify her as an expert. But CRE 702 does not require such qualifications. Louthan's experience was sufficient under the liberal standard of CRE 702. *See Golob v. People*, 180 P.3d 1006, 1012 (Colo. 2008).

### 2. Scope of Louthan's Testimony

¶ 68 According to Vidauri, Louthan's testimony exceeded the bounds of her purported expertise: "Ms. Louthan did not opine as

an expert in eligibility determination," but rather, "she testified as a fraud investigator."

¶ 69    True, Louthan's testimony encompassed both benefits eligibility, a subject matter for which the trial court had accepted her as an expert, and her findings from the fraud investigation, which the court had not separately addressed in its pretrial order. The court's decision to allow Louthan to testify about the fraud investigation was not manifestly erroneous. Louthan had conducted the investigation. Her opinions and inferences were limited to those rationally based on her perceptions, which CRE 701 allows. *Cf. People v. Stewart*, 55 P.3d 107, 122 (Colo. 2002) (approving of a trial court's decision to admit portions of a police officer's testimony about observations of the crime scene and his investigation as lay opinion testimony). And to the extent that her testimony about the fraud investigation exceeded the knowledge of an ordinary citizen, Louthan had sufficient experience and training in fraud investigations to satisfy CRE 702's threshold.

¶ 70    The better course would have been for the trial court to instruct the jury that Louthan was testifying in a dual capacity. *See United States v. Tucker*, 714 F.3d 1006, 1016 (7th Cir. 2013)

(Trial courts "must take precautionary measures to ensure the jury understands how to properly evaluate [dual-capacity witnesses]. Such safeguards can include cautionary jury instructions . . . ."). But such an instruction is not required by rule or our case law. And because Vidauri did not ask the court to do so, we cannot say that the court abused its discretion. *See, e.g.*, *People v. Sanchez*, 184 Colo. 379, 382, 520 P.2d 751, 752 (1974) ("[W]hether or not to give a cautionary instruction is within the trial court's discretion.").

### 3. Helpfulness to the Jury

¶ 71    At trial, Vidauri objected to Louthan reading computerized records from the Colorado Benefits Management System and discussing spreadsheets that Louthan had created during the fraud investigation. Vidauri argues that these aspects of Louthan's testimony were not helpful to the jury "because it was based on exactly the same information the jury had[.]"

¶ 72    This argument misapprehends the role of an expert witness. Louthan's testimony may have helped the jury understand complex evidence. A lay juror would not have been familiar with how the state tracks correspondence with recipients of public assistance through the Colorado Benefits Management System. This

31

testimony may have helped the jury understand how frequently the Department contacted Vidauri and Vidauri's failure to respond. The spreadsheets collated disparate financial information into a single source. Thus, Louthan served as a summary witness to aid the jury's understanding of Vidauri's finances.

### 4. Usurping the Role of the Jury

¶ 73    Next, Vidauri argues that statements made by Louthan about aspects of Vidauri's benefit applications which Louthan found to be "odd and questionable," "concerning," "inappropriate," "inconsistent," or "incomplete" usurped the role of the jury. Vidauri conflates the CRE 608 prohibition against opining on another witness's truthfulness on a specific occasion with whether something the witness created was accurate. A court may allow opinion testimony even if it touches on credibility under CRE 704. *See People v. Ashley*, 687 P.2d 473, 475 (Colo. App. 1984). The portions of Louthan's testimony at issue focused on specific inconsistencies between Vidauri's applications and tax returns. These statements by Louthan were the type of opinions allowed by CRE 704. *See People v. Weeks*, 2015 COA 77, ¶ 89 (discussing factors to determine whether an expert has usurped the jury's

32

function). The trial court's decision to overrule Vidauri's objections to these portions of Louthan's testimony was not manifestly arbitrary, unreasonable, or unfair.

## 5. Danger of Unfair Prejudice

¶ 74 In her pre-trial motion, Vidauri argued that the prosecution was "attempting to paint a veneer of 'expertise' over the factual testimony that should be analyzed by the jury like any other lay witness." She renews this argument on appeal, adding that Louthan's testimony "served no purpose but to present unqualified opinions . . . about Ms. Vidauri's veracity and guilt, under the guise of expertise." However, we have already rejected her challenge to Louthan's qualifications and her mischaracterization of the opinions as going to her veracity.

¶ 75 Of course, an expert cannot opine on guilt. *See People v. Destro*, 215 P.3d 1147, 1152 (Colo. App. 2008) ("[T]he expert offered no opinion regarding defendant's guilt."). But as discussed above, Louthan only expressed opinions on the inconsistencies between Vidauri's applications and other sources of information. These opinions left the jury free to determine guilt or innocence by, for example, crediting Vidauri's assertion that she had been merely

33

careless.  And given CRE 403's strong preference for admissibility and the relevance of Louthan's testimony, we discern no abuse of the trial court's considerable discretion.

## IV.  Prosecutorial Misconduct

¶ 76    Vidauri points to statements made by the prosecutor during voir dire, witness examination, and closing arguments that she argues denied her a fair trial.  We see no reversible error.

### A.  Background

¶ 77    During voir dire, the prosecutor presented prospective jurors with a pair of analogies to explain the concepts of circumstantial evidence and reasonable doubt.  One analogy involved a picture of a puppy with red dirt on its nose sitting by a hole in yard.  The prosecutor asked if anyone would "have trouble concluding what happened."  Then the prosecutor asked, "[D]o you think it's a reasonable doubt to think that aliens could have come down to the backyard and dug the hole?" or "maybe it was the Russians who invade and steal the dog away.  Are you able to exclude those as possibilities because they're not reasonable?"

¶ 78    The second analogy involved a law school student who embellished facts on his admissions application.  The prosecutor

34

asked jurors if they were tasked with deciding whether the student lied, could they set aside their sympathies and biases and make a decision about the student's veracity. For this analogy, the prosecutor engaged in a brief dialogue with the jurors. One juror suggested that the false information in the student's application may not have been "a material part of [the student's] acceptance to law school[.]" Then the prosecutor moved on to ask other jurors what they thought about his hypothetical before returning to the juror who raised materiality. The prosecutor reframed the hypothetical so that all they had to do was "merely decide if there [had been] a technical violation" of the application process. Vidauri did not object during voir dire.

¶ 79 While the prosecutor examined Louthan, he asked Louthan if she "believe[d] that [Vidauri's] application packet . . . was complete[,]" if Louthan "had any reason to believe" that Vidauri or her husband was self-employed, and if Vidauri had failed to provide the Department information about her income for the period in question. Vidauri's counsel objected to this line of inquiry as burden-shifting, which the court overruled.

¶ 80     During closing arguments, the prosecutor revisited the puppy and law student analogies. He also introduced a new analogy:

> [A] good analogy here is you walk into Best
> Buy . . . and you steal a DVD player . . . .
> Then the next day you get a coupon in the mail
> that said, 'Hey, you've won one free Best Buy
> DVD player.' Does it wash out in the end?
> Sure, it does. But does that negate the fact
> that you actually went in and you did steal the
> DVD player? No, it doesn't.

Following the Best Buy analogy, the prosecutor said that Vidauri's "lack of honesty, her lack of being forthright is what caused all of these issues . . . ."

¶ 81     The prosecutor also said that none of the Department's employees could "recall a single phone call from Ms. Vidauri or a single attempt from Ms. Vidauri to activate or update her application." However, Sabrina Hickel, an eligibility training specialist with the Department, had spoken with Vidauri once to verify income information for one of Vidauri's employees, but Vidauri did not attempt to update her information on that call. Patricia Ulloa, an eligibility technician with the Department, was a friend of Vidauri. But when Vidauri reached out to Ulloa about her

case, Ulloa responded that she could not assist on account of the conflict of interest.

¶ 82    Finally, during the prosecutor's rebuttal closing, he listed several questions that Vidauri should have asked the Department. And he said that the benefits Vidauri received "are expenses that the State of Colorado paid out.  Those are expenses and money that we are not going to get back as taxpayers . . . ."  At no point during the closing argument did Vidauri object.

## B.  Preservation and Standard of Review

¶ 83    The parties agree that Vidauri preserved the burden-shifting claim.  Vidauri argues that she preserved other claims of prosecutorial misconduct because she filed a pre-trial motion to strike Louthan's testimony.  But Vidauri concedes that she did not object to the prosecutor's statements during voir dire or closing arguments.

¶ 84    "The determination of whether a prosecutor's statements constitute inappropriate prosecutorial argument is an issue within the trial court's discretion, and we will not disturb its ruling . . . in the absence of a showing of gross abuse of discretion resulting in prejudice and a denial of justice." *People v. Strock*, 252 P.3d 1148,

1152 (Colo. App. 2010) (citation omitted). An appellate court reviews unpreserved claims of alleged misconduct under the plain error standard, which requires reversal only "when there is a substantial likelihood that [the misconduct] affected the verdict or that it deprived the defendant of a fair and impartial trial." *Id.* at 1153.

## C. Law

¶ 85 "[A] prosecutor, while free to strike hard blows, is not at liberty to strike foul ones." *Domingo-Gomez v. People*, 125 P.3d 1043, 1048 (Colo. 2005) (citation omitted). We draw the line when a prosecutor misstates the evidence or uses arguments calculated to inflame the jury. *People v. Brown*, 313 P.3d 608, 618 (Colo. App. 2011).

¶ 86 An appellate court uses a two-step approach to analyze claims of prosecutorial misconduct. First, we must determine whether the prosecutor's conduct was improper based on the totality of the circumstances. If the conduct was improper, then we must decide whether the misconduct warrants reversal. *Wend*, 235 P.3d at 1096. And we evaluate improper arguments "in the context of the argument as a whole and in light of the evidence before the jury." *People v. Samson*, 2012 COA 167, ¶ 30.

¶ 87    A prosecutor "may employ rhetorical devices . . . so long as he

or she does not thereby induce the jury to determine guilt on the

basis of passion or prejudice, attempt to inject irrelevant issues into

the case, or accomplish some other improper purpose." *People v.

Allee*, 77 P.3d 831, 837 (Colo. App. 2003).  But the devices cannot

trivialize the state's burden.  *People v. Camarigg*, 2017 COA 115M,

¶ 45.

¶ 88    During voir dire, a prosecutor engages in misconduct when

the prosecutor misstates the law, uses voir dire to present facts that

the prosecutor knows will not be proven at trial, or argues the case

to the jury.  *People v. Krueger*, 2012 COA 80, ¶ 50.

¶ 89    To assess allegations of burden-shifting, courts

> consider the degree to which: (1) the
> prosecutor specifically argued or intended to
> establish that the defendant carried the
> burden of proof; (2) the prosecutor's actions
> constituted a fair response to the questioning
> and comments of defense counsel; and (3) the
> jury is informed by counsel and the court
> about the defendant's presumption of
> innocence and the prosecution's burden of
> proof.

*People v. Santana*, 255 P.3d 1126, 1131-32 (Colo. 2011) (footnotes

omitted).

¶ 90     Finally, a prosecutor cannot encourage jurors to place themselves in the victim's position. These "golden rule" arguments are improper because "they encourage the jury to decide the case based on personal interest . . . rather than on a rational assessment of the evidence." *People v. Munsey*, 232 P.3d 113, 123 (Colo. App. 2009).

## D. Application

¶ 91     We conclude that the trial court did not abuse its discretion in overruling the burden-shifting objection and discern no plain error in other statements made by the prosecutor.

### 1. Burden-Shifting During Witness Examination

¶ 92     The line of questioning to which Vidauri objected dealt with an essential part of the case — Vidauri's honesty in dealing with the Department. It did not involve proof at trial. The prosecutor never said that Vidauri bore the burden of disproving anything. The prosecutor acknowledged the state's burden repeatedly throughout his opening statement and closing arguments, and the court properly instructed the jury on the prosecution's burden. *See Santana*, 255 P.3d at 1131 ("[E]ven though a prosecutor's comments and questions may imply that a defendant has the

40

burden of proof, such comments and questions do not necessarily shift the burden of proof[.]").

## 2. The Analogies

¶ 93 According to Vidauri, "[u]sing a picture of a cute puppy, particularly when . . . juxtaposed with the suggestion of aliens or . . . 'Russians who invade and steal the dog away'" was an attempt to trivialize the prosecution's burden of proof. With the law student and Best Buy analogies, Vidauri argues that the prosecutor misstated the law and "encouraged the jury to disregard an essential element" of the charges against her.

¶ 94 Viewed in the totality of this case, these analogies were not obviously improper. The discussion about all three was brief. The prosecutor properly emphasized the importance of jurors using common sense and everyday experience to understand the concept of reasonable doubt. *See Clark*, 232 P.3d at 1293 ("Jurors must rely on the evidence presented at trial and their own common sense to determine the question of guilt."). He never drew a direct parallel between the puppy, aliens, Russians, or hypothetical law students — all rhetorical devices — and the anticipated evidence, the

41

prosecution's burden, or what the defense might argue. *See Allee*, 77 P.3d at 837.

### 3. Misstatement of Evidence

¶ 95 The prosecutor's statement that three Department employees couldn't "recall a single phone call from Vidauri" was inaccurate. But the significance of this misstatement, when evaluated in the context of the prosecutor's closing argument as a whole and in light of the evidence presented over a three-day trial, was minimal. *See People v. Eckert*, 919 P.2d 962, 967 (Colo. App. 1996) (holding that certain "inappropriate characterizations" by the prosecutor were not numerous and did not predominate over the rest of the argument that appropriately addressed the evidence, and concluding that these comments did not prevent the jury from rendering a fair verdict). The court instructed the jury that statements by the attorneys are not evidence. We discern no way in which this single misstatement could have affected the verdict or deprived Vidauri of a fair trial. *See People v. Denhartog*, 2019 COA 23, ¶ 66 ("The prosecutor's single misstatement does not cause us to question the reliability of the judgment of conviction and we therefore discern no plain error.").

#### 4. Appealing to the Jurors as Taxpayers

¶ 96    The prosecutor's statement during closing argument that "we are not going to get back [the benefits that Vidauri received] as taxpayers" was an improper golden rule argument. However, given the brevity of this statement in the context of the entire closing argument, as well as the obvious adverse impact on the public fisc of all fraudulently obtained benefits, we cannot say that this argument substantially affected the verdict or deprive Vidauri of a fair trial. *See Munsey*, 232 P.3d at 123 (holding that a golden rule argument that appeals to jurors as taxpayers was inappropriate, but that isolated comment was unlikely to substantially influence the verdict).

### V. Cumulative Error

¶ 97    Vidauri contends the combined impact of numerous errors denied her right to a fair trial. We have found only two unpreserved errors that were not plain. Even though plain errors can be considered for cumulative error purposes, *see Howard-Walker v. People*, 2019 CO 69, we cannot discern how any combination of the two unpreserved errors in the prosecutor's closing argument — which were not plain — could have deprived Vidauri of a fair

trial.  *See People v. Herdman*, 2012 COA 89, ¶ 79 (holding that two unrelated errors were not sufficient to warrant reversal under cumulative error).

## VI.  Conclusion

¶ 98    The felony theft conviction is reversed and the case is remanded for the trial court to enter a conviction of class 1 petty theft.  In all other respects, the judgment is affirmed.

JUDGE FURMAN and JUDGE BROWN concur.