23CA0007 Peo v Hurd 12-31-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA0007
Arapahoe County District Court No. 20CR1796
Honorable Shay K. Whitaker, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Keason Qwame Hurd,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE HAWTHORNE*
Pawar and Yun, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced December 31, 2025

---

Philip J. Weiser, Attorney General, Allison S. Block, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, John P. Finnegan, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1     Defendant, Keason Qwame Hurd, appeals his convictions for second-degree assault, second-degree kidnapping, felony sexual assault, and harassment.  We affirm.

I.     Background

¶ 2     In July 2020, Hurd was in a relationship with B.R.  One evening, B.R. was asleep in Hurd's bed when Hurd accessed her cell phone and viewed a video of B.R. performing a consensual sexual act with her ex-boyfriend.  Hurd became angry and awakened B.R. to confront her about the video.  Hurd then hit B.R.'s mouth with his hand.

¶ 3     Hoping to de-escalate the situation, B.R. ran to the bathroom. Hurd followed her and put her in a "chokehold," causing her to fall to the floor.  Hurd then urinated on B.R. before hitting her again and spitting on her.  Afterwards, B.R. removed her clothes and put them in a plastic bag before getting in the shower.  Hurd "stood at the shower" waiting for her.

¶ 4     Hurd then drove B.R. home in his truck.  When they arrived at her house, B.R. exited the truck.  She went back to retrieve her phone and saw Hurd recording the video "that was in [her] phone . . . onto his phone."  As she entered the truck, Hurd hit her again and

1

began driving them back to his home.  B.R. tried to exit the truck while it was moving but Hurd pulled her back inside.

¶ 5     Upon arriving home, Hurd told B.R. that if she did not do whatever he wanted, he would "beat" her again.  He removed B.R.'s wig and clothes and ordered her to get in the shower.  He then urinated on her again and recorded himself doing so.  Hurd then ordered B.R. to perform oral sex on him, which he continued to record.

¶ 6     After B.R. showered and went into the living room, Hurd followed her and directed her to pose in various positions while he photographed her nude.  While B.R. sat in the living room "staring into space," Hurd became aggravated and put her in another chokehold.  B.R. testified that she couldn't breathe and that she fainted from the chokehold.

¶ 7     When B.R. awoke, she was on the couch and found Hurd rubbing a dirty mop over her body "as if [she] was the floor."  Hurd told her that he was "mop[ping] the floor with these dirty bitches."  Hurd was recording himself on his cell phone while he was "mopping".  B.R. attempted to crawl away from Hurd and hide.

Ultimately, she came out of hiding and fell asleep on the couch. Hurd then drove her home the next morning.

¶ 8    Two days later, B.R.'s mother noticed that B.R. "wasn't in a good state."  B.R. asked her mother to take her to urgent care where she was examined by a forensic nurse examiner ("FNE") and reported the incident to the police.

¶ 9    The prosecution charged Hurd with first degree assault, sexual assault, and second degree kidnapping.  Hurd's counsel requested that the lesser nonincluded counts of harassment and criminal invasion of privacy be added.  The trial court only allowed the instruction on harassment.

¶ 10   A jury convicted Hurd of second degree assault – strangulation; sexual assault, causing submission through force or violence, threat of harm, and threat of retaliation; second degree kidnapping and the kidnapped person being a victim of sexual assault; and harassment.  The jury also found that Hurd committed each offense as an act of domestic violence.

¶ 11   Hurd appeals contending that the trial court reversibly erred by failing to (1) suppress all evidence obtained from his cell phone; (2) grant a mistrial; (3) suppress prosecutorial misconduct during

closing argument; and (4) instruct the jury on the lesser included offense of invasion of privacy. He also contends that the cumulative impact of these errors requires reversal. We disagree and affirm the trial court's judgment.

## II.     Cell Phone Warrant

¶ 12     Hurd contends that the trial court erred by denying his motion to suppress his cell phone records because the search warrant's scope was overbroad and not sufficiently particular. He also contends that the affidavit submitted with the search warrant did not establish probable cause for the search warrant. We disagree.

## A.     Additional Facts

¶ 13     During the police investigation, B.R. reported that Hurd used his cell phone to record himself urinating on her, to film her performing oral sex on him, and to photograph her after her shower. When Hurd was taken into custody, his cell phone was "in his personal belongings." The police officer's affidavit supporting the search warrant for Hurd's cell phone described the events that B.R. told officers at the hospital, where she reported the incident with Hurd. The warrant authorized a forensic extraction of the following from Hurd's phone:

- Any and all artifacts that would tend to establish ownership and/or use of the cellular phone, including but not limited to assigned phone number, device ID, serial number, electronic identifying number, associated cloud account.

- Any and all contacts contained within the cellular phone's native contacts list or within any downloaded application, which would potentially contain contact information for the victim, [B.R.] and [Hurd].

- Any and all call logs […] which would potentially identify communication between the victim and suspect.

- Any and all [messages], including partial and deleted messages or chats [… ] which would potentially contain communications between victim and suspect.

- Any and all images, videos, or audio files, including partial or deleted files […] which may depict the victim or any sexual activity.

- Any and all device location, mapping, or GPS information, which may assist with determining the locations of the alleged physical and sexual assaults.

¶ 14    Hurd filed a motion to suppress the evidence obtained from his cell phone, relying generally on *People v. Coke*, 2020 CO 28, and arguing that "the warrant application and affidavit did not establish probable cause" and that it "was unconstitutionally lacking in particularity." The prosecution responded that the warrant "particularized" the items to be seized, each supported by probable cause as outlined in the officer's affidavit and further limited the scope to relevant crimes and information connecting B.R. and Hurd.

¶ 15    After a hearing, the trial court denied the motion in part and ordered that the evidence collected from the search warrant be further restricted to "a timeline, not as to photos and videos, but [...] a timeline for the other items and materials from July 1 to July 13, the date of [...] Hurd's arrest."

### B.    Standard of Review and Applicable Law

¶ 16    "In reviewing a suppression order, we defer to the trial court's findings of fact if they are supported by the record and review its legal conclusions de novo, taking into consideration the totality of the circumstances, to determine whether the suppression order should be upheld or set aside." *People v. Davis*, 187 P.3d 562, 563-64 (Colo. 2008). If we determine the court erred by failing to

6

suppress evidence, the error is reversible unless it was harmless "beyond a reasonable doubt." *Niemeyer v. People*, 2024 CO 58, ¶ 50 (quoting *Hagos v. People*, 2012 CO 63, ¶ 11).

¶ 17    The United States and Colorado Constitutions protect individuals against "unreasonable searches and seizures." U.S Const. amend. IV; Colo. Const. art. II, § 7. When analyzing the legality of a search, the touchstone is reasonableness. *People v. Davis*, 2019 CO 24, ¶15. And reasonableness generally requires a warrant. *Id.* at ¶ 16.

¶ 18    A lawful search warrant must describe with particularity both "the place to be searched" and "the things to be seized." *People v. Pacheco*, 175 P.3d 91, 94 (Colo. 2006). Particularity limits the government's discretion in examining private information and prohibits general exploratory rummaging. *People v. Seymour*, 2023 7 CO 53, ¶44. To satisfy particularity, a cell phone search warrant must include specific limitations based on (1) the type of alleged criminal activity; (2) the identity of the alleged victim; and (3) if applicable, the timeframe within which the suspected crime occurred. *People v. Herrera,* 2015 CO 60, ¶ 20; *see also Coke*, ¶ 34 (finding insufficient particularity where the warrant permitted the

7

officers to search all texts, videos, pictures, contact lists, phone records, and any data based on ownership absent a specific or reasonable timeframe).

¶ 19    However, "a warrant doesn't lack particularity simply because it is broad." *Seymour,* ¶46. "Likewise, a search isn't unconstitutional simply because the government, in some lightning-fast, digital sense, very cursorily examines unrelated documents." *Id.* at ¶47. "Even when a warrant is adequately particularized, 'it is certain that some innocuous documents will be examined . . . to determine whether they are, in fact, among those papers authorized to be seized.'" *Id.* (quoting *Andresen v. Maryland,* 427 U.S. 463, 482 n.11(1976)).

¶ 20    The warrant's description of the property to be seized should permit the officer charged with executing the warrant to know with a reasonable degree of certainty what should be seized. *Coke,* ¶ 34. Given modern cell phones' immense storage capacities and ability to collect and store many distinct types of data in one place, courts have recognized that cell phones "hold for many Americans 'the privacies of life'" and are, therefore, entitled to special protections from searches. *Id.* at ¶ 37 (citation omitted). And a warrant

authorizing the search of a cell phone simply for general indicia of ownership violates the Fourth Amendment's particularity requirement. *See Herrera,* ¶¶ 4, 18.

## C. Analysis

¶ 21 We conclude that the court did not err by denying Hurd's motion to suppress because the warrant was sufficiently particular.

¶ 22 Unlike in *Coke,* where the warrant lacked details about the alleged victim or when the assault occurred, here the officer's affidavit and subsequent warrant narrowed what could be seized to information that related to Hurd or B.R. The officer's affidavit, in particular, described the alleged crimes, when they were committed, and the history between Hurd and B.R. *Herrera,* ¶ 20; *see also Coke,* ¶ 34.

¶ 23 On appeal, Hurd relies on *Coke* and *Herrera* to suggest that the warrant lacked particularity. But these cases are distinguishable. The warrant in *Coke* authorized police to "search all texts, videos, pictures, contact lists, phone records, and *any data* that showed ownership or possession." *Coke,* ¶ 38 (emphasis added). It also allowed law enforcement to search for and seize "any . . . fruits or proceeds of a crime, or data intended to be used in the

commission of a crime." *Id.* at ¶ 35. The warrant in *Herrera* authorized a search of the defendant's cellphone for text messages between the defendant and the putative child victim as well as for "indicia of ownership." *Herrera*,¶ 18. In contrast, the officers executing Hurd's warrant did not rely on a general search warrant like those in *Coke* and *Herrera*. While the warrant did permit the search of "[a]ny and all artifacts that would tend to establish ownership and/or use of the cellular phone," it was more limited: only items such as "assigned phone number, device ID, serial number, electronic identifying number, associated cloud account" could be seized. Further, the warrant specified the types of information to be searched (communications, images, videos, audio files, call logs, and device locations that pertained to the alleged crime), and narrowed what could be seized to information that related to Hurd or B.R. Also, by incorporating the probable cause affidavit, the warrant was restricted to evidence pertaining to Hurd's assault on B.R.

¶ 24     Recently, a division of this court distinguished the search warrant before it in *People v. Rodriguez-Ortiz*, 2025 COA 61, 574 P.3d 1196, from the general search warrant addressed in *Herrera*.

The *Rodriguez-Ortiz* division concluded that the *Hererra* warrant authorized a search of the "entire contents" of the defendant's phone. *People v. Herrera,* 2015 CO 61, ¶ 34. But the warrant in *Rodriguez-Ortiz* authorized the collection of "location data and certain message content surrounding the crimes [] within the six-month timeframe of the crimes." 2025 COA 61, ¶ 34. The *Rodriguez-Ortiz* division also concluded that while the warrant could have been more particular by limiting each category using the language "related to the crimes," the warrant's incorporation of the attached affidavit served the same function. *Id.* at ¶ 34. The division ultimately concluded that the warrant "did not allow for a general rummaging in" the defendant's phone and personal information, rather it targeted specific data that could be used to establish the defendant as a suspect. The search warrant before us also incorporates the officer's affidavit and thus limited the warrant's scope by the parameters found in the officer's affidavit. So the warrant did not authorize a general rummaging in Hurd's phone but instead targeted specific data that law enforcement used to establish Hurd as a suspect. *See People v. Roccaforte,* 919 P.2d 799, 803-804 (Colo. 1996) (recognizing a broad search warrant is

11

nonetheless permissible when the requested evidence is justified by the nature of the crime or crimes).  We conclude that the search warrant satisfied the particularity requirement required by the Fourth Amendment.

¶ 25     Hurd also contends that the affidavit submitted with the search warrant did not establish probable cause for the search warrant.  However, on appeal, Hurd does not develop this argument to explain why the affidavit did not establish sufficient probable cause.  So we decline to address his argument further.  *See People v. Rodriguez-Morelos*, 2022 COA 107M, ¶ 49 (declining to address a defendant's conclusory and underdeveloped argument), *aff'd*, 2025 CO 2.

### III.     Prior Bad Acts Evidence

¶ 26     Hurd contends that the trial court erred by denying his motion for a mistrial after it improperly admitted CRE 404(b) evidence.  We are not persuaded and conclude that because the alleged references made to Hurd's prior bad acts were fleeting and ambiguous, the trial court did not abuse its discretion.

## A.    Additional Facts

¶ 27    Before trial, Hurd filed a motion objecting to the admission of Hurd's prior bad acts that were outside the charged allegations. During the pretrial conference, the prosecution acknowledged that they "did not file [a] 404(b)" and that they "[understood] the constraints of that." The court advised the parties to approach the bench during trial if either party felt that "a door has been opened" to any prior bad acts evidence.

¶ 28    During trial, the prosecution asked B.R. why she had not run away to get help. B.R. responded, "I don't know . . . I knew what was going to happen. It is also something similar [to something that] happened before." Defense counsel objected and, after a bench conference, the court struck B.R.'s answer and instructed the jury to disregard it.

¶ 29    As the prosecutor continued, B.R. said that she was "pretty sure his neighbors heard [them] fighting before." Defense counsel objected, and the court sustained the objection. Hurd's counsel requested a mistrial because B.R. had mentioned prior bad acts twice and a curative instruction would not "cover that." The court denied the mistrial because it found that B.R.'s second statement

13

could have referred to the same night "an hour or so before [] the altercation had taken place previously." The court denied the request for mistrial, gave the prosecutor the opportunity to "clean up that statement," and admonished B.R. about her statements.

¶ 30 The prosecutor later asked B.R. if she had an eye injury because of the incident and B.R. said, "I don't remember if I had like a busted eye socket or not at that time. I don't know if it was that time." Defense counsel again requested a mistrial based on this "reference to a prior bad act." The court denied the request because it "did not hear [the testimony] as a statement that was being made in terms of reference to another event. But that [B.R.] just didn't know if she had a broken eye socket."

¶ 31 Next, B.R.'s mother testified that Hurd "secretly recorded her one other time and [B.R.] said it wasn't as humiliating." Defense counsel asked the court to strike the statement and again requested a mistrial. The court denied the request but struck the response and told the prosecutor, "[W]e need to dance very closely at this point in time if these witnesses don't want to have to come back and do this a second time."

¶ 32    Finally, the prosecution called the FNE as an expert in "forensic nurse examination, strangulation, and intimate partner violence." The court qualified her as an expert but noted it would not allow testimony about "a cycle of violence." The prosecution asked the FNE if someone "who has been subjected to intimate partner violence sometimes have a delay in reporting." The FNE responded,

> [FNE]: Yes.
>
> [Prosecutor]: Why is that?
>
> [FNE]: Well, as I explained a little earlier, intimate partner violence is a very complex cycle of violence. Many of these patients in these relationships do love and care for that person, even though that person is hurting them. And this cycle repeats itself multiple times throughout the course of the relationship and typical cycles of violence […]

¶ 33    The prosecutor interrupted the FNE and ended the direct testimony shortly afterward. Before cross-examination, defense counsel objected to the testimony and requested a mistrial, arguing the FNE "essentially told the jury that this has happened before." The court denied the request.

15

## B. Standard of Review and Applicable Law

¶ 34  "A mistrial is a drastic remedy that is warranted only when the prejudice to the [moving party] is so substantial that its effect on the jury cannot be remedied by other means." *People v. Cousins*, 181 P.3d 365, 373 (Colo. App. 2007) (quoting *People v. Dore*, 997 P.2d 1214, 1221 (Colo. App. 1999)).

¶ 35  A trial court has broad discretion to grant or deny a motion for a mistrial, and we will not reverse its decision absent an abuse of that discretion and prejudice to the moving party. *People v. Salas*, 2017 COA 63, ¶ 9. "A trial court can better evaluate any adverse effect that improper testimony might have upon a jury than can a reviewing court. Thus, absent an abuse of discretion, the trial court's denial of a motion for mistrial will not be disturbed on review." *People v. Ned*, 923 P.2d 271, 274 (Colo. App. 1996).

¶ 36  Other acts evidence is excluded by Rule 404(b)(1) when its only logical relevance depends on the inferences that (1) a defendant's prior misconduct shows his or her bad character; and (2) the defendant, due to that bad character, thus engaged in the wrongful conduct at issue. *People v. Shores*, 2016 COA 129, ¶ 33 (citing *People v. Spoto*, 795 P.2d 1314, 1318 (Colo. 1990)). When

16

"inadmissible evidence of other crimes is brought to the attention of the jury, the factors relevant to the exercise of discretion to declare a mistrial include the nature of the inadmissible evidence, the weight of admissible evidence of guilt, and the value of a cautionary instruction." *People v. Vigil*, 718 P.2d 496, 505 (Colo. 1986).

## C.    Analysis

¶ 37    We disagree with Hurd's assertion that the testimonial evidence for which he requested a mistrial is as problematic as that addressed in *People v. Goldsberry*, 509 P.2d 801 (Colo. 1973) ("when such evidence is so highly prejudicial, as it is here, it is inconceivable that but for its exposure, the jury may not have found the defendant guilty."). Similar to the challenged testimony in *Vigil*, P.2d 496 at 505, the potential impact of the fleeting and ambiguous references to Hurd's prior conduct is far more difficult to discern. And considering that the evidence of Hurd's guilt is substantial, we perceive no reason to assume that the jury's verdict was influenced to any significant extent by the jury's exposure to the challenged testimony. *See Id.* The fleeting and ambiguous testimony was not so prejudicial as to necessitate the drastic remedy of a mistrial. *See People v. Lahr*, 2013 COA 57, ¶ 27 ("[W]e do not view [a] fleeting,

ambiguous reference as so prejudicial that the drastic remedy of declaring a mistrial was required.").

¶ 38     Moreover, the court took proper steps to remedy any potential prejudice to the jury caused by the challenged testimony. The court struck the testimony and instructed the jury to disregard it. It then instructed the prosecution to cure any confusion with further questioning, and it admonished the witness. "[A] curative instruction is generally sufficient to overcome an evidentiary error, and an instruction is inadequate only when evidence is so prejudicial that, but for its exposure, the jury might not have found the defendant guilty." *People v. Gillespie*, 767 P.2d 778, 780 (Colo. App. 1988) (citing *Vigil v. People*, 731 P.2d 713 (Colo.1987)).

¶ 39     Hurd cites *Goldsberry* to argue that the curative instruction striking B.R.'s testimony did not cure the alleged prejudice to the jury. In *Goldsberry*, the supreme court said that"[w]hen reference is made in the presence of the jury to [unrelated] criminal activity, a mistrial is normally required." 509 P.2d at 803. But the supreme court has since clarified that "*Goldsberry*...did not displace the general rule that a trial court's determination whether or not to grant a mistrial will not be disturbed absent an abuse of

18

discretion." *Vigil*, 718 P.2d at 505. And "[t]he circumstances are ... rare where we ... will depart from the presumption that a jury follows a court's curative instructions." *People v. Salas*, 2017 COA 63, ¶ 14 (quoting *Qwest Servs. Corp. v. Blood*, 252 P.3d 1071, 1091 (Colo. 2011)). Absent contrary evidence, we presume the jury understood and followed the trial court's instructions. *See People v. Abdulla*, 2020 COA 109M, ¶ 58 ("[W]e employ the presumption that the jury understands and applies the given instructions unless a contrary showing is made . . . .")

¶ 40    We are not persuaded that the ambiguous testimonial references to uncharged events necessitated a mistrial. And defense counsel could have requested a less drastic remedy. *See Abbott*, 690 P.2d at 1269 ("[A] mistrial is only warranted where the prejudice to the accused is too substantial to be remedied by other means.") We conclude that the trial court did not abuse its discretion by denying Hurd's requests for a mistrial.

IV.    Prosecutorial Misconduct

¶ 41    Hurd contends that the prosecution improperly "asked the jurors to imagine themselves in B.R.'s position" and "lowered its burden of proof by inaccurately describing the reasonable doubt

19

standard" through "its arguments during voir dire and closing.".
We disagree.

A.    Additional Facts

¶ 42    During voir dire, the prosecutor asked prospective jurors how they might feel if asked to describe their last consensual sexual encounter in front of the people in the room.  A few jurors responded that they would feel uncomfortable and embarrassed.  The jurors also added that it would probably be more difficult if the encounter was nonconsensual and the sexual partner was also present in the audience.  The prosecutor then asked the jurors how they would expect a victim of a nonconsensual sexual encounter to "come off or testify or act".  The prospective jurors responded to the range of reactions and attitudes such a victim might have.

¶ 43    The prosecutor said in her opening statement, "I don't know exactly what [B.R.] is going to say while she testifies.  But what I do know is that that is a difficult thing to talk about.  She was hurt; she has to talk about what happened in front of strangers."

¶ 44    In closing argument, the prosecutor said

> Let's talk about [B.R.]. . . . Why is she coming all the way over here from Chicago, being made to go up on the witness stand and

> subjected to hours of cross-examination
> of having you guys see embarrassing, horribly
> humiliating videos of her. . . . Why after this
> would she go back to him.
>
> Think about in voir dire when we talked a little
> bit about that. That some people don't report
> to the police. Some people go back to their
> abusers. You heard that there is a hesitancy.

¶ 45    During rebuttal closing argument, the prosecutor reminded the jurors that they witnessed how difficult it was for B.R to testify about an intimate and traumatic incident in front of a courtroom full of strangers.

¶ 46    During closing argument, the prosecutor also discussed the burden of proof:

> You're also given the definition of reasonable
> doubt. And it's a doubt based on your common
> sense but it can't be a doubt based on
> speculation of what if there is something we
> didn't hear or what if this happened. If you
> don't hear that it happened, it's speculation to
> believe that it did. It's the difference between
> something that's possible and evidence that
> actually occurred in this case.
>
> So, yes, is it possible that something may have
> happened, yeah. But if there was no evidence
> of it, then you can't consider it. That would be
> speculation. It would be speculative to believe
> that there was some conversation where he
> said she could do this to him because you
> haven't heard any evidence that there was.

21

¶ 47    The prosecutor went on to say

> You may have questions like, you know, what
> happened seven days earlier where she called
> him and she was — you heard a little bit of
> evidence that she called him and was
> kind of like saying she wanted to see him or
> they were talking about potential phone calls
> that she had with other men.  You didn't hear
> any evidence though that she said I will
> consent for you to do anything that you want
> to me.  So that would be speculation.

¶ 48    The prosecution then said in rebuttal argument:

> You're not allowed to speculate.  So the fact
> that her sister did not come to Court or did not
> cooperate, did not respond to Detective
> Singleton does not mean that the elements
> have not been proven beyond a reasonable
> doubt.  The defense wants you to speculate
> that [B.R.] made it up because she is somehow
> mad at the defendant that she didn't want the
> defendant to follow through with his threats to
> post the videos so she just made it all up. . . .

B.      Standard of Review and Applicable Law

¶ 49    Because Hurd did not contemporaneously object to the
prosecutor's comments, we review his prosecutorial misconduct
claim for plain error.  *People v. Vialpando*, 2022 CO 28, ¶20.  We
reverse under the plain error standard only if the court erred and
the error was obvious and substantial.  *Hagos*, ¶14, 288 P.3d at
120.  An error is obvious if it contravenes a clear statutory

22

command, a well-settled legal principle, or established Colorado case law. *People v. Crabtree*, 2024 CO 40M, ¶ 42. An error is substantial if it "so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction." *Id.* at ¶ 43 (quoting *Wilson v. People*, 743 P.2d 415, 420 (Colo. 1987)).

¶ 50    In reviewing a prosecutorial misconduct claim, we conduct a two-step analysis. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). We determine first whether "the prosecutor's questionable conduct was improper based on the totality of the circumstances and, second, whether such actions warrant reversal according to the proper standard of review." *Id.*

¶ 51    Because "[a]dvocates must be able to present their best case to achieve just results," prosecutors have "wide latitude in the language and presentation style used to obtain justice." *Domingo-Gomez v. People*, 125 P.3d 1043, 1048 (Colo. 2005). During closing argument, a prosecutor "may refer to the strength and significance of the evidence, conflicting evidence, and reasonable inferences that may be drawn from the evidence." *People v. Walters*, 148 P.3d 331, 334 (Colo. App. 2006). However, a prosecutor's "arguments and

rhetorical flourishes must stay within the ethical boundaries" that our supreme court has drawn. *Domingo-Gomez,* 125 P.3d at 1048.

¶ 52    Prosecutors must refrain from "express[ing] a personal belief or opinion as to [the] truth or falsity of [a witness's] testimony," *Wilson,* 743 P.2d at 419; intentionally misstating the evidence or the law, *Domingo-Gomez,* 125 P.3d at 1048-49; and making "golden rule" arguments because "they encourage the jury to decide the case based on personal interest . . . rather than on a rational assessment of the evidence," *People v. Munsey,* 232 P.3d 113, 123 (Colo. App. 2009).

¶ 53    A "golden rule" argument invites jurors to put themselves in the place of the victim and imagine that the defendant wronged them personally. *People v. Dunlap,* 975 P.2d 723, 758 (Colo. 1999); *People v. Randell,* 2012 COA 108, ¶ 87. Such an argument is improper in the guilt phase of a case because it could encourage the jury to base its decision on personal interest and emotion rather than on a rational evaluation of the evidence. *People v. Munsey,* 232 P.3d 113, 123 (Colo. App. 2009).

## C.     Analysis

¶ 54     We reject Hurd's assertion that the prosecutor made an improper "golden rule" argument. "A true 'golden rule' argument invites jurors to put themselves in the place of the victim and imagine that the defendant wronged them personally, thereby inflaming passions and prejudice." *People v. Randell*, 2012 COA 108, ¶ 92. Given the totality of the circumstances, we conclude that no plain error occurred.

¶ 55     Regarding the statements made during voir dire, the prosecutor asked the jurors to consider B.R.'s difficulties in testifying and the overall effect that it would have on her testimony. The prosecutor did not ask the prospective jurors to place themselves in the victim's shoes concerning the offenses charged. And voir dire is not in a trial's guilt phase. Voir dire allows counsel to inquire whether potential jurors hold any biases that would prevent the defendant from receiving a fair trial. *People v. Wilson*, 2013 COA 75, ¶ 12.

¶ 56     As to the prosecutor's closing argument, "prosecutors have wide latitude in the language and style they choose to employ." *People v. Duncan*, 2023 COA 122, ¶ 31 (quoting *People v. McMinn*,

2013 COA 94, ¶ 60).  And "because arguments delivered in the heat of trial are not always perfectly scripted, reviewing courts accord prosecutors the benefit of the doubt when their remarks are ambiguous or simply inartful." *People v. Samson*, 2012 COA 167, ¶ 30.  To determine whether a closing argument was improper, we consider the language used, the statements' context, the evidence's strength, and whether the prosecutor repeated the misconduct. *People v. Lovato*, 2014 COA 113, ¶ 64.

¶ 57      We may also consider a failure to object because it may "demonstrate defense counsel's belief that the live argument, despite its appearance in a cold record, was not overly damaging." *Id.* at ¶ 65 (quoting *People v. Wallace*, 97 P.3d 262, 269 (Colo. App. 2004)).  Given these demanding requirements, "[p]rosecutorial misconduct in closing argument rarely constitutes plain error." *Id.* (alteration in original) (quoting *Liggett v. People*, 135 P.3d 725, 735 (Colo. 2006)).

¶ 58      We disagree with Hurd's argument that the prosecutor's closing remarks lowered the prosecution's burden of proof.  The prosecutor's statements regarding jurors speculating about evidence responded to defense counsel's closing argument that B.R.

"regret[ted] those videos exist[ing]" and that "regretting that [she] consented to something after the fact [did] not negate the fact that [she] consented to it." Defense counsel also argued that "the only way that this is against her will is if he has so badly beaten her, threatened her to the point that she feels she has to say yes or something worse will happen." So the prosecutor's arguments did not lower the prosecution's burden of proof but rather informed the jury that a verdict could not be supported by "guessing, speculation, conjecture, or a mere modicum of relevant evidence" such as that suggested by defense counsel's arguments. *Donald*, ¶19. We conclude that the prosecutor's closing arguments did not constitute prosecutorial misconduct or plain error. And even if we conclude that the prosecutor engaged in prosecutorial misconduct, any error did not rise to the level of being so substantial as to warrant reversal. "Only prosecutorial misconduct that is 'flagrantly, glaringly, or tremendously improper' warrants reversal under the plain error test." *People v. Duncan*, 2023 COA 122, ¶ 33 (quoting H*agos*, ¶ 14, 288 P.3d at 120).

## V. Lesser Nonincluded Offense Jury Instruction Was Not Warranted

¶ 59    Hurd contends that the trial court erred by applying the wrong legal standard when it denied his request for the court to instruct the jury on the lesser nonincluded offense of criminal invasion of privacy.  We disagree.

### A. Standard of Review and Applicable Law

¶ 60    We review the trial court's decision whether to give a particular jury instruction for an abuse of discretion.  *People v. Manyik*, 2016 COA 42, ¶ 65; *see also People v. Wartena*, 2012 COA 12, ¶ 30 ("Whether the record contains sufficient evidence to support instruction on a lesser offense is a factual inquiry reviewed for an abuse of discretion.").

¶ 61    A defendant is entitled to an instruction on a lesser nonincluded offense — "a lesser offense that requires proof of at least one element not contained in the charged offense" — "so long as a rational evidentiary basis exists to simultaneously acquit him of the charged offense and convict him of the lesser offense." *People v. Naranjo*, 2017 CO 87, ¶¶ 15, 17.  We review de novo whether statutory elements support a rational evidentiary basis that would

allow a jury to acquit the defendant of a greater offense and convict him of the lesser offense. *People v. Naranjo*, 2015 COA 56, ¶ 11 (citations omitted.) In deciding whether the defendant is entitled to the proffered instruction, the court must consider the evidence in the light most favorable to the defendant. *Mata-Medina v. People,* 71 P.3d 973, 979 (Colo. 2003). But "the mere chance that a jury may reject uncontroverted testimony and convict on the lesser charge does not require the trial court to instruct the jury on the lesser charge." *People v. Ramirez,* 18 P.3d 822, 827 (Colo. App. 2000).

¶ 62    The theory behind allowing a lesser offense instruction is that such an instruction "promotes . . . fairer verdicts" because it "helps ensure that a jury does not convict a defendant of a greater offense than the one actually committed merely because the greater offense is the only crime charged and the jury is persuaded that some crime was committed." *Naranjo*, ¶ 16 (concerning lesser nonincluded offenses); *see also Skinner,* 825 P.2d at 1047 (The importance of a lesser offense instruction is that "the jury might not be aware that it has the option of acquitting the defendant on the greater charge and convicting him of a lesser charge.").

¶ 63    The prosecution charged Hurd with sexual assault —
submission against the victim's will, through the use of physical
force or violence, or threat of harm, or threat of retaliation.  § 18-3-
02(1)(a),(4)(a),(b),(c), C.R.S. 2025.  Hurd's proposed lesser
nonincluded instruction on criminal invasion of privacy defines the
crime as: "knowingly observ[ing] or tak[ing] a photograph [or video]
of another person's intimate parts […] without that person's
consent, in a situation where the person observed or photographed
has a reasonable expectation of privacy."  § 18-7-801, C.R.S. 2025.

## B.    Analysis

¶ 64    Though  Hurd argued that criminal invasion of privacy was "a
lesser non-included of the acts that are included by the
[p]rosecution" and that "[t]hey're proof of this – []all these charges,"
the trial court found that the offense did not "specifically relate to
any of the crimes" charged in the case.  In other words, the trial
court ruled there was no rational evidentiary basis that would
support instructing the jury on the lesser nonincluded offense.  We
agree.

¶ 65    The jury convicted Hurd of the lesser-included offense of second-degree assault, sexual assault, second-degree kidnapping, and the lesser nonincluded harassment offense.

¶ 66    We agree with the trial court that a rational evidentiary basis did not exist to acquit Hurd of the charged sexual assault - submission against the victim's will, through the use of physical force or violence, or threat of harm, or threat of retaliation offense -- and simultaneously convict him of the proposed lesser included offense of criminal invasion of privacy.  Considering the trial evidence, including the videos taken by Hurd on his phone during his assaults on B.R., we agree with the trial court that no rational evidentiary basis existed to convince the jury to simultaneously acquit Hurd of the sexual assault charge and convict him on the criminal invasion of privacy charge.  That is, there is no risk that the jury would view the explicit and graphic videos of the sex acts and conclude that the acts were consensual, and only the nude photographs were not, leaving them with the only option of convicting of the greater offense.

¶ 67    Moreover, Hurd's theory of defense did not include a claim that he was guilty of criminal invasion of privacy.  Instead, he

claimed that he did not assault or kidnap B.R. and that any sexual conduct was consensual. The "consent" element in his proposed lesser nonincluded jury instruction does not refer to the victim's consent to sexual conduct but to the victim's consent to her intimate parts being photographed. § 18-7-801; *see also People v. Wartena*, 2012 COA 12, ¶ 36 ("A lesser nonincluded offense instruction is tantamount to a defendant's theory of the case instruction" and "is in the nature of a strategy" (quoting *People v. Skinner*, 825 P.2d 1045, 1047-48 (Colo. App. 1991).

¶ 68 We conclude that the trial court did not abuse its discretion by refusing to instruct the jury on the lesser-included offense of criminal invasion of privacy.

## VI. Cumulative Error

¶ 69 Since we have rejected all of Hurd's claims on appeal, we necessarily reject his cumulative error argument. *People v. Walton*, 167 P.3d 163, 169 (Colo. App. 2007) (Because there are not multiple errors to compound, the defendant cannot be awarded relief on a cumulative error basis.).

## VII. Disposition

¶ 70 The judgment is affirmed.

JUDGE PAWAR and JUDGE YUN concur